UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
THELMA HIGUEROS, on behalf of herself
and as class representative of all those          No. 07 Civ. 0418 (ADS)(ETB)
similarly situated,

               Plaintiff,

       -against-                                    **DECLARATION**

NEW YORK STATE CATHOLIC
HEALTH PLAN, INC.,
d/b/a FIDELIS CARE, INC.,

            Defendant.
-----------------------------------------------------------------X

    I, Jennifer F. DiMarco, pursuant to 28 U.S.C. §1746, declare under penalty of perjury

under the laws of the United States of America that the foregoing is true and correct:

    1.    I am an attorney duly admitted to the bar of the State of New York and I am

associated with the law firm Mintz Levin Cohn Ferris Glovsky and Popeo, P.C. ("Mintz Levin"),

counsel for New York State Catholic Health Plan, Inc. d/b/a Fidelis Care New York, Inc.

("Fidelis"). I submit this Declaration in Opposition to Plaintiffs' June 30, 2009 Motion for

Miscellaneous Relief Pursuant to Fed. R. Civ. P. 23 and 26(c) and Pursuant to 29 U.S.C.

§ 216(b), and Plaintiffs' subsequent July 2, 2009 Motion Pursuant to Fed. R. Civ. R. 23(d) (the

"Rule 23 Motions").

    2.    The conduct about which Mr. Sutter complains is not only completely refuted by

the Declaration of Mark Lane, dated July 24, 2009, and the Declarations of several marketing

representatives who decided against participating in this action, but as described below, it is

belied by Fidelis' own conduct, of which Plaintiffs' counsel is fully aware, in dealing with its

marketing representatives and their decisions to join, stay in or withdraw from this suit.

3.     After the class notice periods expired, Frank & Associates notified counsel for Fidelis, Mintz Levin, that one current employee, Leticia Martinez, and two former employees, Manuel Andrade and Christopher Tennant, had expressed a desire to withdraw the opt-in notices that they had previously sent to Frank & Associates.  Accordingly, Mintz Levin asked Frank & Associates to send a Notice of Withdrawal to these individuals so they could officially nullify their participation in the action.  Although this was done, only Mr. Andrade executed a Notice of Withdrawal (*See* Notice of Withdrawal for Manuel Andrade, attached hereto as Exhibit A).

4.     Given that Ms. Martinez, a current employee, had signed both a Consent to Joinder and an opt-out form, Mintz Levin sought permission from Frank & Associates to present Ms. Martinez with another Notice of Withdrawal Form.  Frank & Associates agreed to allow Fidelis to present Ms. Martinez with a Notice of Withdrawal.  Thereafter, without commenting on or discussing the substance of the document, Fidelis presented Ms. Martinez with an additional Notice of Withdrawal.  However, to date, Ms. Martinez has not signed the Notice of Withdrawal that Fidelis provided to her and Fidelis has not communicated with her again regarding this lawsuit or her decision to participate in this lawsuit.

5.     Mintz Levin similarly requested that Frank & Associates permit Fidelis to contact Mr. Tennant for the purpose of providing him with another Notice of Withdrawal form.  Frank & Associates denied Fidelis' request, without stating a basis for its objection (*see* e-mail, dated June 9, 2009, attached hereto as Exhibit B), but Fidelis nonetheless has refrained from contacting Mr. Tennant regarding his expressed desire to rescind his Consent to Joinder.

6.     Fidelis' actions, in refraining from communicating with these class members who have indicated that they do not wish to be part of the action, runs contrary to Mr. Sutter's claims that Fidelis communicated with its employees to pressure them not to join the case.  Fidelis has

acted, and continues to act, meticulously in its efforts to avoid communicating with class members in any way that could be deemed abusive, coercive or misleading. Fidelis' course of action with respect to Mr. Andrade, Mr. Tennant and Ms. Martinez demonstrate that Fidelis has continued to act properly with respect to communications with class members in this action.

7.     Had Frank & Associates contacted Fidelis' counsel regarding Mr. Sutter's claims, it would have learned that Fidelis does not object to Mr. Sutter withdrawing his opt-out form and joining the case, even though the class notice periods have long since expired. In this regard, Fidelis did not object to Frank & Associates filing a Consent to Joinder for Evelyn Stefos well after the expiration of the notice periods (*see* Consent to Joinder filed for Evelyn Stefos, dated April 30, 2009, attached hereto as Exhibit C, and an e-mail, dated May 20, 2009, attached hereto as Exhibit D).

8.     Attached hereto as Exhibit E is a true and correct copy of *Dziennik v. Sealift, Inc.*, 05 Civ. 4659, 2006 WL 1455464 (E.D.N.Y. May 23, 2006).

9.     Attached hereto as Exhibit F is a true and correct copy of *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, 06 Civ. 528, 2007 WL 3036891 (N.D. Ind. Oct. 12, 2007).

10.     Attached hereto as Exhibit G is a true and correct copy of *Bell v. Addus Healthcare, Inc.*, 06 Civ. 5188, 2007 WL 2752893 (W.D. Wash. Sept. 19, 2007).

11.     Attached hereto as Exhibit H is a true and correct copy of *In re Visa Check/Mastermoney Antitrust Litig.*, 96 Civ. 5238, 2006 WL 1025588 (E.D.N.Y. Mar. 31, 2006).

12.     Attached hereto as Exhibit I is a true and correct copy of *Ralph Oldsmobile, Inc. v. General Motors Corp.*, 99 Civ. 4567, 2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001).

13.     Attached hereto as Exhibit J is a true and correct copy of *Basco v. Wal-Mart Stores, Inc.*, 00 Civ. 3184, 2002 WL 272384 (E.D. La. Feb. 25, 2002).

14.     Attached hereto as Exhibit K is a true and correct copy of *Jenifer v. Delaware Solid Waste Authority*, 98 Civ. 270, 1999 WL 117762 (D. Del. Feb. 25, 1999).

15.     Attached hereto as Exhibit L is a true and correct copy of *Sjoblom v. Charter Communications, LLC*, 07 Civ. 0451, 2007 WL 5314916 (W.D. Wis. Dec. 26, 2007).

Dated: July 30, 2009
       New York, New York

Jennifer F. DiMarco

4655991v.9

4

# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

THELMA HIGUEROS, on behalf of herself
and as class representative of all those
similarly situated,

                  Plaintiff,

    v.

NEW YORK STATE CATHOLIC
HEALTH PLAN, INC.,
d/b/a FIDELIS CARE, INC.

           Defendant.

------------------------------------------------------------------

No. 07 Civ. 0418
(ADS) (ETB)

## NOTICE OF WITHDRAWAL

By my signature below, I, Manuel D. Andrade Jr., hereby withdraw my status as a consented to party plaintiff in the above captioned matter which I voluntarily signed on or about March 11, 2009. I have advised Frank & Associates, P.C. of my wishes to withdraw and they have accepted the same. I understand that I am no longer represented personally by counsel since I do not wish to continue as a consented to party plaintiff. My request to withdraw has nothing to do with the merits of the case nor should my position reflect on Frank & Associates, P.C. I have been advised that I may be called as a witness. I have been advised that I will no longer be represented by Frank & Associates, P.C.

I have signed below under my own free will and without duress or coercion. The decision to withdraw from this case is made voluntarily.

 

Manuel Andrade
Print Name

104 Oak Place #8
Address Syracuse, NY 13203

                           Signature

                           5-7-09
                           Date

# Exhibit B

**From:** promero@laborlaws.com
**Sent:** Tuesday, June 09, 2009 11:46 AM
**To:** DiMarco, Jennifer
**Cc:** Arnold, Michael
**Subject:** Higueros v. Fidelis

Jennifer and Mike

  Please be advised that Plaintiffs do have an objection to Fidelis contacting Christopher Tennant, Amy Schaefer and Leticia Martinez about their withdrawal forms.

Peter

# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

THELMA HIGUEROS, on behalf of herself
and as class representative of all those
similarly situated,

                  Plaintiff,

      -against-

NEW YORK STATE CATHOLIC
HEALTH PLAN, INC.,
d/b/a FIDELIS CARE, INC.,

                  Defendant.

--------------------------------------------------------------X

**RECEIVED**
3|6|09

No. 07 Civ. 0418 (ADS)(ETB)

## Form 1 - Consent to Joinder -
## Federal Fair Labor Standards Act Case

### Federal Law Claim

**You must mail this form to be a part of the
Federal Fair Labor Standards Act Case**

    I wish to participate in the Fair Labor Standards Act part of the case filed by Thelma Higueros against Fidelis. I understand that I may choose, instead, to retain an attorney of my own choosing to represent me, but that if I do so, my attorney must file an opt-in notice with the Court. By signing below I _Evelyn Stetos_ (print name) consent to become a party plaintiff in this lawsuit brought under the federal Fair Labor Standards Act of 1938, as amended 29 U.S.C. §201, et seq., to recover unpaid overtime from my current/former employer Fidelis. I agree to be bound by any judgment herein, favorable or unfavorable, and I have returned this form to the address below within sixty days of my receipt to:

*Peter A. Romero*
*Frank & Associates, P.C.*
*500 Bi-County Blvd., Suite 112N*
*Farmingdale, New York 11735*

    I hereby authorize the law firm of Frank & Associates, P.C. to represent me in this case.

Signature: _Evelyn Stetos_      Print name: _Evelyn Stetos_

Address: _70 Yale Terrace_
_Blauvelt, NY 10913_      Phone Number: _845 664 4680_
                                              " 271-9045

# EXHIBIT D

| | |
|---|---|
| **From:** | DiMarco, Jennifer |
| **Sent:** | Wednesday, May 20, 2009 10:06 AM |
| **To:** | 'promero@laborlaws.com' |
| **Cc:** | Rubin, Jennifer; DiMarco, Jennifer; Arnold, Michael; Patricia Pastor |
| **Subject:** | Discovery Matters |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Peter,

Further to our discussion yesterday, I am writing to confirm that Fidelis will not object to the late filing of Evelyn Stefos' consent form.

With regard to the withdrawal forms for Leticia Martinez, Amy Schafer and Christopher Tennant, please confirm today whether you will be sending these individuals another withdrawal form and if not, whether you would object to Fidelis sending withdrawal forms to these individuals.

Finally, and as to the questionnaire, I would greatly appreciate if you could confirm as soon as possible today whether you have compared your mailing list to the the list of opt-out plaintiffs to determine whether you mailed the questionnaire to anyone on the opt-out list other than Diana Gil and Rachele Pickett.

Thank you in advance.

Best regards,
Jennifer

Jennifer F. DiMarco
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
direct: (212) 692-6260
fax: (212) 983-3115

Exhibit E



**H**Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Sylvester DZIENNIK, et al., Plaintiffs,
v.
SEALIFT, INC., et al., Defendants.
**No. 05-CV-4659 (DLI)(MDG).**


May 23, 2006.


Ralph J. Mellusi, Tabak Mellusi & Shisha, New
York, NY, for Plaintiffs.

Gordon S. Arnott, Hill, Betts & Nash LLP, New
York, NY, for Defendants.


*ORDER*

GO, United States Magistrate Judge.


**\*1** Plaintiffs, who are foreign nationals employed as
seamen on certain vessels owned by defendants,
bring this putative class action to recover, *inter alia,*
full wages owed under employment contracts, collec-
tive bargaining agreements and/or various laws, in-
cluding overtime wages and delay wages. This order
addresses plaintiffs' motion to compel defendants to
produce unredacted employment contracts for all
putative plaintiffs (ct.doc.22), and defendants' cross-
motion for an order limiting communications be-
tween plaintiffs and their counsel and members of the
putative class (ct.doc.24).


*DISCUSSION*


I. *Identifying Information of Putative Class Members*

Plaintiffs seek to compel production of unredacted
employment contracts of putative plaintiffs, including
their names and addresses. The defendants produced
the documents in response to plaintiffs' discovery
request for the "employment contracts of all persons
who fell within the putative class description de-
scribed by plaintiff."*See* ct. doc. 22, Exh. A. In their
response, defendants produced two lists of seamen

who fall within the putative class description without
identifying information and sample employment con-
tracts pertaining to each list, but with all identifying
information redacted. *See id.,* Exh. B. Plaintiffs argue
that the redacted information is necessary to verify
defendants' other discovery responses which are in-
complete.

A party may obtain discovery of any non-privileged
matter that is relevant to a claim or defense of any
party. Fed.R.Civ.P. 26(b)(1). Nevertheless, "discov-
ery, like all matters of procedure, has ultimate and
necessary boundaries." *Oppenheimer Fund, Inc. v.
Sanders,* 437 U.S. 340, 351 (1978). In *Oppenheimer,*
the Supreme Court held that the production of class
members' names was not "within the scope of legiti-
mate discovery." 437 U.S. at 354 (ordering produc-
tion of names and addresses under Rule 23 for notice
purposes where class was certified). Although the
Court acknowledged that it did "not hold that class
members' names and addresses never can be obtained
under the discovery rules," those instances are lim-
ited to issues relevant to class certification such as
numerosity or where contact with members of the
class could yield information relevant to issues in the
case. *See id.* at 351 n. 13, 354 n. 20.

Courts have ordinarily refused to allow discovery of
class members' identities at the pre-certification stage
out of concern that plaintiffs' attorneys may be seek-
ing such information to identify potential new clients,
rather than to establish the appropriateness of certifi-
cation. *See, e.g., Hatch v. Reliance Ins. Co.,* 758 F.2d
409, 416 (9th Cir.1985) (affirming denial of motion
to produce names of similarly situated investors); *In
re Mortgagors of Temple-Inland Mortgage Corp.,*
No. Civ. A. 99-CV4633, 2001 WL 177181, at *2
(E.D.Pa. Jan. 24, 2001); *Buycks-Roberson v. Citibank
Federal Sav. Bank,* 162 F.R.D. 338, 342
(N.D.Ill.1995) (in redlining action against bank,
plaintiffs were not entitled to loan files without re-
dacted addresses where loan applicant's names were
also redacted); *Flanigan v. Am. Fin. Sys. of Ga.,* 72
F.R.D. 563, 563 (M.D.Ga.1976) ("Rule 23 should not
be used as a device to enable client solicitation");
*Crabtree v. Hayden, Stone Inc.,* 43 F.R.D. 281, 283
(S.D.N.Y.1967) ("the purpose of the pre-trial discov-
ery rules ... is to enable the parties to prepare for trial

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 1455464 (E.D.N.Y.)
 **(Cite as: 2006 WL 1455464 (E.D.N.Y.))**

with respect to their own bona fide existing claims, not to determine whether third parties may have similar claims"); *but see Wiginton v. Ellis,* No. 02 C 6832, 2003 WL 22232907, at *4 (N.D .Ill. Sept. 16, 2003) (ordering defendant to produce list of female employees in sexual harassment action).

**\*2** All but one of the cases cited by plaintiff involve claims under the Fair Labor Standards Act ("FLSA") or the Age Discrimination in Employment Act ("ADEA") which have different procedures for potential class members to opt in to any collective action brought. *See Hoffman-LaRoche Inc. v. Sperling,* 493 U.S. 165 (1989) (ADEA); *United States v. Cook,* 759 F.2d 987 (2d Cir.1986) (FLSA); *Patton v. Thomson Corp.,* 364 F.Supp.2d 263 (E.D.N.Y.2005) (FLSA); *Whitworth v. Chiles Offshore Corp.,* No. Civ. A 921505, 1992 WL 365153 (E.D.La. Nov. 25, 1992) (FLSA). Those cases are easily distinguishable because the limitations period continues to run until the potential class member opts in, giving rise to a need to identify and provide notice to potential class members promptly. *See In re Mortgagors,* 2001 WL 177181, at *2.

Plaintiffs claim the information is necessary to verify defendants' discovery responses since defendants have provided false information on several occasions regarding the number of putative plaintiffs. For example, plaintiffs note that defendants' discovery response lists only one foreign seaman that was employed in 2006 while plaintiffs claim they have independently identified at least 24 foreign seafarers that have been employed on Sealift vessels in 2006. *See* ct. doc. 22 at 5. However, as defendants point out, plaintiffs' discovery request only covered the putative class period, from January 1, 1999 until September 28, 2005. *See* ct. doc. 24 at 6; ct. doc. 22, Exh. A. Therefore, defendants' response may not necessarily be incomplete or inaccurate as to seamen employed in 2006.

Plaintiffs further point to the deposition testimony of James Hannon, crewing manager of Sealift, in a related case, *Felskowski v. Sealift,* 04-CV-1244, that 8 to 10 Polish seafarers were hired in 2004 for the entire Sealift fleet while defendants' discovery response lists at least 35 Polish seafarers employed in 2004. *See* ct. doc. 22 at 6, Exh. B. Without the benefit of Mr. Hannon's deposition transcript, it is impossible for the Court to draw any conclusion about the consistency of Mr. Hannon's testimony with defendants' discovery responses.[FN1]

> FN1. Plaintiffs' other allegations regarding Sealift's attempts to deceive the United States Coast Guard are unsupported by any evidence submitted with their application.

On this record, plaintiffs have not demonstrated the relevance of the information they seek beyond their argument that the names are necessary to verify defendants' responses. Plaintiffs already have sufficient information to identify the number of putative class members for class certification purposes. Thus, plaintiffs' application is denied without prejudice to a future application should circumstances warrant.

II. *Restrictions on Communications Between Plaintiffs' Counsel and Members of the Putative Class and Sealift Employees*

Defendants seek an order restricting communications between plaintiffs and their counsel and any members of the putative class. In support, defendants submit two emails they argue demonstrate that plaintiffs have engaged in improper communications with members of the putative class. One email is from a Polish fitter advising that he had received phone calls from a representative of a company called "P and I Services Navigator" pressuring him to sign a power of attorney to participate in a case against defendant Sealift and asking for the addresses of others with whom he had worked. *See* ct. doc. 24 at 7-8. Another email submitted by defendant is from the captain of a Sealift vessel reporting that several members of his crew or their families were contacted by attorneys. *See id.* at 9-10.The wife of one crew member was advised by these attorneys not to contact a crewing agent used by defendants and that defendants would not hire anymore Filipinos. *See id.* at 3, 10.One of the emails indicates that some of the people contacted were confused as to whether those contacting them were Sealift's attorneys. *See id.* at 10.

**\*3** Fed.R.Civ.P. **23( d)** authorizes the **court** to regulate communications with putative class members even before certification. *See*Fed.R.Civ.P. **23( d)**; *see also Keystone Tobacco Co., Inc. v. U.S. Tobacco Co.,* 238 F.Supp.2d 151, 154 (D.D.C.2002) ("[T]he **Court** rejects defendants' position that it has no authority to limit communications between litigants and putative

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:07-cv-00418-ADS-ETB  Document 219  Filed 07/31/09  Page 16 of 63 PageID #: 1558

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 1455464 (E.D.N.Y.)
 (Cite as: 2006 WL 1455464 (E.D.N.Y.))

class members prior to class certification"); *Ralph Oldsmobile Inc. v. Gen. Motors Corp.,* No. 99 Civ. 4567, 2001 WL 1035132, at *2 (S.D.N.Y. Sept. 7, 2001)."Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil v. Bernard,* 452 U.S. 89, 100 (1981). However, judicial intervention is justified only where there is "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101-02.Such intervention "should result in a carefully drawn order that limits speech as little as possible consistent with the rights of the parties under the circumstances."*Id.*

"Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *In re School Asbestos Litig.,* 842 F.2d 671, 683 (3d Cir.1988)."[A] district court's authority under Rule 23( d) is not limited to communications that actually mislead or otherwise threaten to create confusion, but extends to communications that interfere with the proper administration of a class action or those that abuse the rights of members of the class." *In re Currency Conversion Fee Antitrust Litig.,* 361 F.Supp.2d 237, 252 (S.D.N.Y.2005).

Here, defendants have failed to establish that plaintiffs are engaged in any abusive or unethical communications with absent class members. As a preliminary matter, plaintiffs generally have a right to contact members of the putative class. *See Williams v. Chartwell Financial Servs., Ltd.,* 204 F.3d 748, 759 (7th Cir.2000). Plaintiffs' counsel maintains that the contact was made by investigators who have been instructed to identify for whom they work and that the information sought pertains solely to employment on board Sealift vessels. I find that the vague emails submitted by defendants are insufficient to support findings of need for a limitation that would outweigh the class members' rights. "[T]he mere possibility of abuses does not justify routine adoption of a communications ban that interferes with the formation of a class or the prosecution of a class action in accordance with the Rules." *Gulf Oil,* 452 U.S. at 104.

Defendants also seek an order regulating contact be-

tween plaintiffs and their counsel and any Sealift employees. *See* ct. doc. 24 at 5. Disciplinary Rule 7-104(A)(1) prohibits an attorney from communicating with a party that is represented by another attorney. With regard to employees of a corporate entity, an employee "should be considered a party within the meaning of DR 7-104(A)(1), either because: (1) he/she had high-level managerial responsibility and was capable of binding the corporation; (2) his/her acts or omissions may be imputed to the corporation for purposes of civil or criminal liability; or (3) his/her statements may constitute an admission." *Pauling v. Secretary of the Dep't of Interior,* No. 95 Civ. 8408, 1997 WL 661393, at *1 (S.D.N.Y. Oct. 22, 1997) (quoting *Miano v. AC & R Advertising,* 148 F.R.D. 68, 76-77 (S.D.N.Y.), *aff'd,* 834 F.Supp. 632 (S.D.N.Y.1993)).

**\*4** Thus, there is no support for defendants' request that plaintiffs and their counsel be prohibited from communications with "any Sealift employee." Moreover, since plaintiffs themselves are not attorneys, professional ethical restrictions do not apply to them.[FN2] *See Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.,* No. 02 Civ. 9151, 2004 WL 421789, at *1 (S.D.N.Y. March 5, 2004).

> FN2. On the other hand, "an attorney cannot circumvent Disciplinary **Rules** by requesting or engineering an action be taken by another that, if performed by the lawyer, would violate the Disciplinary **Rules**." *Realuyo v. Diaz,* No. 98 Civ. 7684, 2006 WL 695683, at *12 (S.D.N.Y. March 17, 2006).

*CONCLUSION*

For the foregoing reasons, plaintiffs' **motion** to compel is **denied** and defendants' **motion** for a protective order is **denied**.

**SO ORDERED.**

E.D.N.Y.,2006.
Dziennik v. Sealift, Inc.
Not Reported in F.Supp.2d, 2006 WL 1455464 (E.D.N.Y.)

END OF DOCUMENT

# Exhibit F



Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2007 WL 3036891 (N.D.Ind.), 13 Wage & Hour Cas.2d (BNA) 924
 (Cite as: 2007 WL 3036891 (N.D.Ind.))



United States District Court,
N.D. Indiana,
South Bend Division.
In re FEDEX GROUND PACKAGE SYSTEM, INC.
EMPLOYMENT PRACTICES LITIGATION.
THIS DOCUMENT RELATES TO:
Alexander, et al.
v.
FedEx Ground Packages Systems, Inc., Cause No.
3:06-CV-528 RM.
**No. 3:05-MD-527 RM (MDL-1700).**

Oct. 12, 2007.

*OPINION AND ORDER*

ROBERT L. MILLER, JR., Chief United States District Judge.

**\*1** This case, originally filed in the Northern District of California as that court's Cause No. 3:05-CV-38, is one of several centralized before this court pursuant to the order of the Judicial Panel on Multi-District Litigation creating MDL-1700. The common issue in the cases in the MDL docket is whether FedEx Ground drivers are employees or independent contractors. The reader's familiarity with the general arguments in this docket is presumed.

The plaintiffs in this case assert class claims for nationwide relief under the Family Medical Leave Act and for statewide relief under California law. The plaintiffs amended their complaint this week to add a claim for retaliation in violation of the Family Medical Leave Act. 29 U.S.C. § 2615. Unsurprisingly, no motion to certify a retaliation class has been filed. The matter came before this court for hearing on October 9, 2007 on the plaintiffs' motions for temporary restraining order and preliminary injunction. This opinion is intended to satisfy the requirements of Federal Rule of Civil Procedure 52. For the reasons that follow, the court denies the plaintiffs' motions.

I

On August 13, 2007, the California Court of Appeal

delivered at least a partial defeat to FedEx Ground's contention that its drivers are independent contractors rather than employees. *Estrada v. FedEx Ground Package Systems,* Inc., 154 Cal.App. 4th 1 (2007). The *Estrada* decision affirmed a finding that FedEx Ground's SWA (single work area) contract drivers were employees. On September 20, 2007, FedEx Ground announced to its nationwide workforce of pickup and delivery drivers that, starting October 26, 2007, it is moving to an allMWA (multi-work area) business model in California and will not renew the contracts of the 1,000 or so California SWA contractors. Under this "California Transition" program, no SWA contractors will remain in California by June 2008. The drivers watched a videotaped message from CEO Dave Reholz and received a pamphlet during mandatory meetings at their terminals. FedEx Ground's "California Transition" program applies equally to all California SWA contractors, without regard to whether they have been a party to any litigation.

FedEx Ground drivers operate under written contracts that set terms of one, two, or three years. Each contract contains a provision that automatically renews the contract on a year-to-year basis unless FedEx Ground or the driver prevents renewal. Historically, FedEx Ground has allowed drivers' contracts to renew automatically unless cause exists for mid-term termination of the contract. FedEx Ground didn't terminate any existing contracts; under the "California Transition" program, the contracts simply will not be renewed pursuant to the automatic renewal provision.

Also on September 20, FedEx Ground announced the availability of what it calls voluntary transition incentives for California SWA contractors. The incentives provide financial and other assistance to any SWA contractor wishing to become an MWA contractor, or to help SWA contractors who wish to leave the business and pursue other opportunities. The incentives range from $25,000 to just over $81,000, depending on the SWA contractor's annual revenues from the route. A California SWA contractor must sign a Contractor Conversion and Release Agreement to receive such payments. Section 3(a) of the Contractor Conversion and Release Agreement limits the release to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2007 WL 3036891 (N.D.Ind.), 13 Wage & Hour Cas.2d (BNA) 924
 **(Cite as: 2007 WL 3036891 (N.D.Ind.))**

claims related to the September 20 non-renewal an-
nouncement:

**\*2** Contractor ... releases and discharge[s] ... any and
all claims ... arising out of or in any way connected
with (i) [FedEx Ground]'s announcement(s) that it
is modifying its relationship with contractors in
California, and (ii) any and all actions related to
[FedEx Ground]'s modification of its relationship
with California contractors, including, without
limitation, any contemplated or actual termination,
non-renewal or assignment of [Contractor's] Oper-
ating Agreement, and any contemplated or actual
sale, assignment, or other disposition of a primary
service area....

Section 3(b) of the release agreement, which ad-
dresses Section 1542 of the California Civil Code, is
limited to the claims defined in paragraph 3(a), which
are claims related to the "California Transition." The
materials FedEx Ground provided urges the drivers to
contact their attorneys and includes the name and
methods for contacting the putative class's counsel.

SWA contractors have until October 26, 2007 to ac-
cept or reject these offers. FedEx Ground explains
that it is acting now, with this speed, because it wants
to lay any uncertainty to rest before getting deeply
into its peak season runs from just before Halloween
through the end of the year.

FedEx Ground is free to reject any SWA contractor's
efforts to become an MWA contractor. Any Califor-
nia SWA contractor, in turn, is free to reject the in-
centives and choose instead to continue operating
under the existing terms of his or her Operating
Agreement, though that contractor's contract will not
be renewed at expiration. The materials FedEx
Ground distributed to contractors explain that

No contractor is required to sign the release of claims
documents. Whatever a contractor chooses, nothing
in today's announcement affects any current con-
tract with FedEx Ground, which remains in ef-
fect.... In exchange for the transition incentives,
FedEx Ground is asking California SWAs for a re-
lease of certain potential claims related to this tran-
sition. The release is not intended to settle all
claims you may have against FedEx Ground, and is
limited to potential claims concerning FedEx
Ground's announcement of this transition incen-

tive; the termination, non-renewal or assignment of
the Contractor's Operating Agreement; and any
sale assignment, loss or other disposition of the
Contractor's primary service area.

In the "Question and Answer" section purporting to
explain the decision, FedEx Ground explains:
**Are you making these changes in light of the re-
cent decision in the Estrada case?**We are making
these changes in light of the overall regulatory and
legal environment in California. While the Estrada
case is part of that environment, it is still in the ap-
peals process, and applies to the treatment of some
expenses for certain contractors in California be-
tween 1996 and 2004.

California is the only state with so significant a deci-
sion finding FedEx Ground drivers to be employees.
In all other states, FedEx Ground has told its SWA
contractors that it doesn't anticipate eliminating their
SWA positions "at this time." At least 75% of FedEx
Ground's 12,000 pickup and delivery drivers are
SWA contractors. Most of the drivers know FedEx
Ground's business model was challenged in Califor-
nia and is being challenged on a nationwide basis in
this multi-district litigation docket. Which claims will
be certified for class adjudication, and whether the
SWA contractors and MWA contractors will be
found to be employees, are questions pending before
this court.

**\*3** The plaintiffs say FedEx Ground's decision to
terminate the California SWA contractors was meant
to, and does, send a chilling message to the plaintiffs
and putative class members in this MDL docket
about the consequences they may face if they partici-
pate in the litigation to bring it to a successful con-
clusion. The plaintiffs contend this "California Tran-
sition" is a mass firing of all California SWA con-
tractors that sends a message to all FedEx Ground
drivers that their participation in, or cooperation with,
this or similar lawsuits may result in unemployment.
As a result, the plaintiffs say, their ability to proceed
with this suit will be compromised.

The "California Transition" doesn't change the con-
trol FedEx Ground exercises over its California
MWA contractors. For example, no changes are
made as to how the drivers must perform or what
colors they must display. FedEx Ground coupled its
announcement of the mass California terminations

with the offer of an unprecedented raise for the MWA workforce, called "Enhanced Primary Plus" (EPP). According to FedEx Ground, EPP is geared towards making the MWA "opportunity" more attractive with the ultimate goal of "strengthen[ing] the independent contractor model."To this end, FedEx Ground promises to pay extra annual compensation to its MWA contractors of between $5,000 and $26,000, depending on how many routes a contractor takes on.

The EPP program is mandatory for any California SWA contractor hired back as an MWA contractor. FedEx Ground promises a first EPP payment this year. EPP participants must execute an indemnification agreement; Section 2.2(f) of the Addendum requires a contractor to:

Indemnify FedEx Ground for, and hold FedEx Ground harmless from, any liability and claims by Contractor or any third party, including, but not limited to, any persons utilized by Contractor or governmental entities, arising from Contractor's use or employment of any other person(s) in the performance of Contractor's obligations, including, but not limited to, claims or liabilities arising under industrial accident prevention, workers' compensation, or similar laws or any federal, state or municipal laws applicable to the relationship between and among employers and employees.

FedEx Ground is offering "voluntary transition incentives" of $25,000 to $81,000 to those willing to execute a release of claims. FedEx Ground distributed to each California SWA contractor a release for each driver to sign. To collect the money, the SWA contractors must execute the releases and return them to FedEx Ground no later than October 26, 2007.

The plaintiffs assert that the release's language gives rise to the powerful inference that FedEx Ground intends to leave the door wide to claim-if it so chooses-that the SWA contractors who sign have waived their right to participate as class members in this MDL action. They say the release doesn't precisely state what claims it does, and does not, encompass. As the plaintiffs read it, Section 3(a) suggests that the scope of the release may be limited in some fashion to claims "related" to aspects of the "California Transition," while Section 3(b) suggests that it is intended to be a general release of all possible claims

the signatory driver possesses against FedEx Ground. There is no express exclusion of the claims that have been asserted in the instant MDL actions or the earlier *Estrada* case. The plaintiffs also contend that the releases are being obtained through coercion: the threat of termination.

**\*4** Mr. Rebholz's video message didn't mention the release. FedEx Ground indicated in the written materials that the release is limited to potential claims "concerning" various aspects of the "California Transition." In a section entitled *"Important Legal Note,"* in the "Question and Answer" section, FedEx Ground says:

**"Will the release affect my ability to participate in the pending lawsuits?"**The release is not intended to settle all claims you may have against FedEx Ground, but is limited to potential claims related to this transition. That said, FedEx Ground cannot advise you on your individual circumstances. Please read all documents carefully, and consult your own legal counsel.

The "Entire Agreement" clause in Section 11 states that "any representation, promise or agreement not specifically included in this agreement shall be binding upon or enforceable against either party."The plaintiffs maintain that FedEx Ground's insistence that the drivers sign this document as a condition for being paid what is essentially severance for many years of service, on very short notice, is coercive.

FedEx Ground told the California SWA contractors that they have the option to be rehired by FedEx Ground as MWA contractors. FedEx Ground has always reserved the right to approve, or deny, the application of any driver to add additional routes to his or her contract. FedEx Ground hasn't guaranteed any of the California SWA contractors that they will be approved for additional routes if they wish to be rehired in a MWA contractor status. Driver declarants have previously sought and been denied permission from FedEx Ground to "grow their business" by adding another route, or know others who were denied permission.

FedEx Ground offers incumbent MWA contractors payments of $15,000 for each route now operated by any California SWA contractor they can get between now and May 31, 2008; the plaintiffs see this has

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

essentially putting all of the California routes up for sale. Thus, California SWA contractors will compete with incumbent MWA contractors, as well as with each other, to acquire routes so they can qualify as MWA contractors.

FedEx Ground requires any California SWA contractor who is allowed to acquire an additional route to participate in the EPP program and sign a new contract addendum called a "Compliance Disclosure." Mr. Rebholz's videotaped statement says that the purpose of the Compliance Disclosure Addendum is to "validate compliance with applicable laws." The twelve-page pamphlet says the same thing: "While the operating agreement has always required contractors to comply with all applicable laws and regulations, a new compliance-disclosure addendum will be required of MWAs that elect to participate in the EPP program. In this addendum, MWAs will agree to specific processes to validate compliance with applicable laws."

FedEx Ground didn't hand out the Compliance Disclosure Addendum along with the other documents distributed on September 20 when it announced the EPP. The Compliance Disclosure Addendum requires MWA contractors to treat the others they hire to assist on their routes (e.g., as drivers or helpers) as employees for all legal purposes and to provide FedEx Ground with documentary proof that they have done so. It requires MWA contractors to indemnify FedEx Ground for claims for liability or claims brought at any time against FedEx Ground by the MWA contractor him/herself arising under federal or state employment laws, as well as claims that others might bring against FedEx Ground.

**\*5** FedEx Ground also has offered the EPP program to its MWA contractors nationwide. To be paid the EPP compensation, all MWA contractors must sign the Compliance Disclosure Addendum and waive their legal claims against FedEx Ground. When the new fiscal year begins on June 1, 2008, all MWA contractors will be required to sign the Compliance Disclosure Addendum as a condition of continued employment with FedEx Ground.

Until then, existing MWA contractors in California and elsewhere are not required to accept the EPP payments or sign the Compliance Disclosure Addendum and may continue to work without penalty under

their existing contracts. The materials distributed to contractors emphasize that "Enhanced Primary Plus is a voluntary program for existing Multiple Work Area contractors, not an automatic one."New MWA contractors in California entering into new contracts with FedEx Ground must sign the Compliance Disclosure Addendum.

II

To win a preliminary injunction, a party must show that it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest. If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis, which is to say the district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied. *Christian Legal Society v. Walker,* 453 F.3d 853, 859 (7th Cir.2006) (citations omitted). To satisfy the requirement of a reasonable likelihood of success on the merits, a movant need show only a better than negligible possibility of success, *Washington v. Indiana High Sch. Athletic Ass'n,* 181 F.3d 840, 846 (7th Cir.1999), and the degree of likelihood of success is reflected in the balancing of harms. *Chicago Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc.,* 270 F.3d 1060, 1064 (7th Cir.2001).

A.

The court's discussion begins with the assumption that the plaintiffs bring their request for a preliminary injunction under Federal Rule of Civil Procedure 23(d). Although the plaintiffs didn't cite Rule 23(d) as the basis for the relief they seek, that rule authorizes courts to regulate communications with putative class members about the litigation. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100 (1981) ("Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bounded by the rele-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

vant provisions of the Federal Rules."); *Williams v. Chartwell Fin. Servs., Ltd.,* 204 F.3d 748, 759 (7th Cir.2000) ( "[T]he district court was clearly concerned about the potential for abuse if the plaintiffs were allowed to contact Chartwell's customers, and expressed concern over the effect of such contacts on Chartwell's business. This is a legitimate concern, and certainly presents a potential justification for the district court's limitations on discovery. Nevertheless, a district court's discretion in this area is not unlimited. The plaintiffs have a right to contact members of the putative class, and any discovery limitations should be carefully drawn. The district court's decision as to the protective order must involve a careful balancing of the potential for abuse created by the class action and the right of the plaintiffs to contact potential class members."(citations omitted)). Courts may limit a defendant's communications with putative class members under Rule 23(d) upon a "clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."*Gulf Oil Co.,* 425 U.S. at 101. Otherwise, a defendant's contact with putative class members generally cannot be limited. *See Wiginton v. Ellis,* No. 02 C 6832, 2003 WL 22232907, at *3 (N.D.Ill. Sept. 16, 2003) (plaintiffs' assertions found to be "too speculative" to justify restrictions on communications); *Jenifer v. Delaware Solid Waste Auth.,* Nos. Civ .A. 98-270 & 98-565, 1999 WL 117762, at *4 (D.Del. Feb. 25, 1999) ("[A]n ongoing business relationship, such as the relationship here between DSWA and the waste haulers, can increase the possibility that the communications between litigants are coercive. Where there is a relationship that is inherently coercive, the court does not need to make a finding that a particular abuse has occurred. The court, however, must still require a clear record of threatened abuses. There must be some evidence that justifies an interference with DSWA's speech."(citations omitted)).

**\*6** General Motors announced the cessation of the Oldsmobile line during the pre-class certification period in *Ralph Oldsmobile, Inc. v. General Motors Corp.,* No. 99 Civ. 4567, 2001 WL 1035132 (S.D.N .Y. Sept. 7, 2001). General Motors offered transition payments to its Oldsmobile dealerships (several of which would be in the putative class), but conditioned those payments on the dealerships' execution of releases that included the claims that gave rise to the class action. General Motors' communications with the dealerships about the release made no refer-

ence to the class litigation. The court found potential coercion in the relationship between General Motors and the dealerships-new Oldsmobiles were not available from other sources-and "a potential for unknowing waivers resulting from a lack of information."*Id.* at \*4.

The potential for coercion is similar here. Just as Oldsmobile dealerships could try to arrange to sell Toyotas, but could only get new Oldsmobiles from General Motors, the California SWA contractors might be able to become drivers for another delivery service, but can remain with FedEx Ground only by doing what FedEx Ground requires of them. But potential for coercion such as this inheres in any employment-type relationship and in a wide range of business relationships, so it cannot, standing alone, warrant the types of restriction on speech to which *Gulf Oil* raised the tent flaps. Adding the ingredient of payments of EPPs to contractors who might worry about the financial consequences to them of FedEx Ground's action does not add a cognizable flavor of coercion. *See Fabert Motors, Inc. v. Ford Motor Co.,* 355 F.2d 888, 891 (7th Cir.1966) ("Economic coercion is not established by showing that the release was given under pressure of financial circumstances under threat of Ford's having recourse to an action Ford was legally entitled to take.").

Unlike the releases General Motors demanded of the Oldsmobile dealerships, FedEx Ground's releases did not, until the amended complaint was filed earlier this week, affect the claims at issue in this case, and the releases clearly directed the drivers to class counsel for information about this case. As set forth above, Section 3(a) of the Contractor Conversion and Release Agreement (and so, by virtue of its language, Section 3(b)) is limited to claims relating to the "California Transition" program announced last month. The new Addendum required as part of the EPP provides that an MWA contractor must validate his or her compliance with applicable laws and regulations by providing documentation to the company. The indemnification provision is limited to claims arising from the contractors' relationships with their employees and contains no release of claims that the contractors themselves might have against FedEx Ground. The contractors already had committed to that degree of indemnification obligation in Section 3.5(d) of the current Operating Agreement:

Case 2:07-cv-00418-ADS-ETB   Document 219   Filed 07/31/09   Page 23 of 63 PageID #: 1565

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2007 WL 3036891 (N.D.Ind.), 13 Wage & Hour Cas.2d (BNA) 924
  (Cite as: 2007 WL 3036891 (N.D.Ind.))

**\*7**  *3.5 Contractor's Responsibility for Certain Losses.*The following indemnities constitute an exception to the provision for risk protection to the Contractor provided in subparagraph 3.2. During the term of this Agreement and thereafter, Contractor agrees to indemnify and save FHD harmless against liabilities as follows:

(d) Any or all claims brought against FHD or liabilities incurred by FHD arising from the Contractor's relationship with Contractor's employees, whether under industrial accident prevention laws, or any other federal state or municipal laws, rules, regulations and orders applicable to the relationship between employers and employees.

The plaintiffs say employee expenses are among the categories of damages they seek in this case, and the indemnification provision in the Addendum would waive any such claim by requiring the plaintiffs to repay FedEx Ground for any such expenses FedEx Ground might be required to pay the plaintiffs. The court doesn't read the Addendum as expanding any such obligation already in the current Operating Agreement.

The release appears as though it would extinguish the FMLA retaliation claims in the newly-filed amended complaint because those claims are related to the "California Transition." The *Gulf Oil* Court, though, discouraged limits on anything other than misleading or abusive communication. The release's omission of reference to FMLA retaliation claims can't be called misleading: if those claims exist at all, they did not exist until FedEx Ground announced the package of which the release was a part, and the claims were not filed until the day of the preliminary injunction hearing.

Of course, a communication may be abusive without being misleading, and the plaintiffs contend the existence and communication of the "California Transition" program is abusive. They contend that it conveys-and was intended to convey-the message to drivers that they can be cast aside if they oppose FedEx Ground. The plaintiffs haven't persuaded the court that FedEx Ground's communications to putative class members are abusive in the sense the *Gulf Oil* Court meant. Both sides agree that FedEx Ground was responding to a court decision holding that FedEx Ground's business model was not what FedEx

Ground said it was and that would require FedEx Ground to pay millions of dollars to drivers for what had occurred in the past.

It stretches the language to describe as "abusive" an attempt to stop doing that for which one has just been ordered to pay damages. The plaintiffs take the position that the new model is no different than the old except the California drivers will have multiple, rather than single, work areas. The drivers, say the plaintiffs, still are employees rather than independent contractors. And perhaps the plaintiffs are right. But FedEx Ground has some reason to think, from the record in the *Estrada* litigation, that the law views MWA contractors differently than SWA contractors. If FedEx Ground is wrong on that point, the company might be required to pay post-"California Transition" damages-but no such damages will be required if FedEx Ground is right on that point.

**\*8**  The court doesn't doubt the plaintiffs' affiants' assertions that the "California Transition" has a chilling effect in that it makes drivers fear participation in this case. But a change in a business model seems likely to follow from an appellate's court telling a company that its previous business model is such as to require the payment of millions of dollars in damages. Few changes in business models are cost-free to everyone involved, and suits challenging business models often produce such changes. In effect, the plaintiffs' motion for a preliminary injunction asks that the court to make FedEx Ground continue the business model for which it is being sued and for which the plaintiffs seek damages. That is not the sort of order the *Gulf Oil* Court contemplated.

Federal Rule of Civil Procedure 23(d) does not justify the preliminary injunction sought here.

B.

Federal Rule of Civil Procedure 65 generally covers issuance of preliminary injunctions. FedEx Ground argues that the court has no authority to award preliminary injunctive relief to benefit the uncertified putative class, as distinct from the named plaintiffs, under Rule 65. The argument appears to be a strong one. The putative class members aren't parties to the action at this point in the proceedings. A court generally cannot base injunctive relief under Federal Rule of Civil Procedure 65 on threatened harm to non-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

party putative class members:

> Because a class has not been certified, the only inter-
> ests at stake are those of the named plaintiffs.
> Some own properties that may be affected in the
> future by the Fast Track program, but their interests
> can be protected by an injunction that prevents the
> City from demolishing their properties. That is the
> point of [ *Los Angeles v. Lyons,* 461 U.S. 95 (1983)
> ]: A wrong done to the plaintiff in the past does not
> authorize prospective, class-wide relief unless a
> class has been certified. Why else bother with class
> actions?

 *McKenzie v. City of Chicago,* 118 F.3d 552, 555 (7th
Cir.1997) (citation omitted). Four of the named plain-
tiffs are California SWA contractors who might have
standing to seek preliminary injunctive relief in their
own behalf, but they haven't asked for such relief and
the parties haven't addressed that issue.

The plaintiffs' citations are not inconsistent with the
law as FedEx Ground explains it. In *Moore v. Sum-
mers,* 113 F.Supp.2d 5, 29 (D.D.C.2000), which the
plaintiffs' reply brief describes as "finding prelimi-
nary injunction barring retaliatory conduct pre-class
certification warranted based on chilling effect such
conduct would have on rights of putative class mem-
bers," the district court actually denied injunctive
relief despite finding that some post-filing actions
taken by the defendant Secret Service were likely to
deter potential class members from coming forward
with their claims. *Recinos-Recinos v. Express For-
estry, Inc.,* No. Civ.A. 05-1355, 2006 WL 197030
(E.D.La. Jan. 24, 2006), in which the court issued a
protective order under Rule 23, involved actual
communications with putative class members, albeit
accompanied by physical threats and bribes by al-
leged agents of the defendants, who defended against
the protective order solely on the basis of the evi-
dence and not any claim of impermissibility of an
injunction on non-constitutional grounds. *Mevorah v.
Wells Fargo Home Mortgage, Inc.,* No. C 05-1175,
2005 WL 4813532 (N.D.Cal. Nov. 17, 2005), in-
volved a Rule 23 motion to correct alleged misrepre-
sentations by the defendant.

**\*9** Nonetheless, too little case law specifically ad-
dresses the propriety of relief in the circumstances
presented here for the court to hold comfortably that
the requested injunction relief lies beyond the court's

power under Rule 65. Because the preliminary in-
junction is inappropriate on several other grounds,
the court assumes, without deciding, that Rule 65
would allow preliminary injunctive relief for the
benefit of non-party putative class members were
things as the plaintiffs see them.

1.

The first thing a plaintiff must show in seeking a pre-
liminary injunction under Rule 65 is a likelihood of
success on the merits. *Eco Mfg. LLC v. Honeywell
Int'l, Inc.,* 357 F.3d 649 (7th Cir.2003) (preliminary
injunction properly denied when plaintiff showed no
likelihood of success). The plaintiffs have not shown
a better than negligible chance of success on the mer-
its of their retaliation claim. Later developments in
the case might, of course, result in a plaintiffs' vic-
tory, but the court must evaluate the existent record
when considering a preliminary injunction.

FedEx Ground argues that the plaintiffs have no like-
lihood of success because nothing in the record indi-
cates that they are employees of FedEx Ground, as
distinct from independent contractors who would
have no FMLA rights vis-a-vis FedEx Ground. The
court can't agree. This case is part of an ML docket
in which several filings applicable to all constituent
actions disclose areas in which FedEx Ground con-
trols its drivers' performance of their tasks. Whether
that control is such as to make the drivers "employ-
ees" under federal or any state law remains to be de-
cided, but the plaintiffs have come forth with enough
to show that they might win. Further, while the
*Estrada* decision is not yet final and so does not yet
(if it ever will) amount to collateral estoppel, its exis-
tence demonstrates that FedEx Ground recently exer-
cised enough control over its drivers to amount to an
employer over some employees under someone's law.

While the plaintiffs have at least some chance of
proving they are employees rather than independent
contractors, the rest of their FMLA retaliation claim
is strung together too loosely to support a finding of
likelihood of success at this juncture. To prevail on a
retaliation claim under the FMLA, the plaintiffs will
need to prove that FedEx Ground is terminating their
SWA contracts because they engaged in activity pro-
tected by the FMLA. *Burnett v. LFW, Inc.,* 472 F.3d
471, 481-482 (7th Cir.2006). No causal connection
between the FedEx Ground "California Transition"

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 8
Not Reported in F.Supp.2d, 2007 WL 3036891 (N.D.Ind.), 13 Wage & Hour Cas.2d (BNA) 924
 (Cite as: 2007 WL 3036891 (N.D.Ind.))

and any protected activity by the plaintiffs seems even remotely apparent.

The filing of the *Estrada* case would not appear to be protected activity under the FMLA. The court recognizes that there may have been issues in *Estrada* that were not appealed and of which this court is unaware, but the appellate decision in *Estrada* makes no mention of any federal employment laws; it reports that the drivers were found to be employees within the meaning of Section 2802 of the California Labor Code. 154 Cal.App. 4th at 10. *See also Kodl v. Board of Educ. Sch. Dist. 45,* 490 F .3d 558, 563 (7th Cir.2007) (complaints of general harassment not protected activity under federal employment discrimination laws). Further, the temporal disconnect between the filing of *Estrada* in 1999 and the 2007 "California Transition" announcement is far too great to support-and indeed, tends to negate-any inference of retaliatory intent in 2007. *See, e.g., Scaife v. Cook County,* 446 F.3d 735, 742 (7th Cir.2006) ("But rather than create an inference of causation, the timing of Scaife's suspensions weighs against him."). Further, since FedEx Ground is treating all California SWA contractors identically so far, it appears unlikely that the plaintiffs can establish a retaliation claim via the indirect method by showing that other employees were treated more favorably. *See Hull v. Stoughton Trailers, LLC,* 445 F.3d 949 (7th Cir.2006) (prima facie case of retaliation not made out without proof that plaintiff was treated less favorably than similarly situated employees who did not engage in protected FMLA activity).

**\*10** The drivers' victory in the *Estrada* suit seems to be the event for which the plaintiffs say FedEx Ground is retaliating, and FedEx Ground agrees that the appellate decision in *Estrada* was a (perhaps the primary) motivating factor in the "California Transition." The court is aware of no authority for the proposition that winning a lawsuit is a separate protected activity from filing the suit, so the same timing problem may plague this theory. More importantly, though, winning a lawsuit under a provision of the California Labor Code would not seem to be activity protected by the federal Family Medical Leave Act and so would not support a retaliation claim under the federal act.

The court simply is unable to imagine what protected activity is said to have been undertaken by putative

class members that were not part of the class in *Estrada.*The Family Medical Leave Act supports one of the claims in this suit, but the plaintiffs filed this suit in 2005, again too long ago to support, and perhaps so long ago as to defeat, an inference of retaliatory motive.

For all these reasons, the court concludes that plaintiffs have shown no likelihood of success on the merits of their FMLA retaliation claim. In the same spirit in which the court handled the issue of its authority to issue the requested injunction, though, the court concedes the possibility that the plaintiffs have shown a better than negligible chance of success (though not at all a strong one) and proceeds with the balance of the analysis.

                           2.

The plaintiffs have not demonstrated a threat of irreparable injury. An injury is not irreparable if there is an adequate remedy at law, and there is an adequate remedy at law if the injury can be compensated by money damages. If the plaintiffs or putative class members are losing their jobs for an illegal reason, those losses are compensable by an award of damages. *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.,* 414 F.3d 700 (7th Cir.2005); *Bedrossian v. Northwestern Memorial Hosp.,* 409 F.3d 840 (7th Cir.2005). If the plaintiffs or punitive class members are being required to sign illegal waivers and/or indemnity clauses, it is difficult to articulate any harm, irreparable or otherwise, from signing an unenforceable waiver.

The plaintiffs' affidavits from drivers who worry for their livelihoods if they step forward raise concern; loss of class members and eager witnesses cannot easily be quantified in dollars. But while the plaintiffs have cited cases that establish a court's authority to enjoin a defendant from picking off potential members by bribe, thuggery, or misdirection, *Recinos-Recinos v. Express Forestry,* Inc., No. Civ.A. 05-1355, 2006 WL 197030 (E.D.La. Jan. 24, 2006); *Mevorah v. Wells Fargo Home Mortgage, Inc.,* No. C 05-1175, 2005 WL 4813532 (N.D.Cal. Nov. 17, 2005), none of the cases suggest an independent right to have fellow class members or enthusiastic witnesses that can be protected from otherwise lawful business conduct.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3.

**\*11** To the extent the plaintiffs might be said to have established that they will suffer some irreparable harm without the requested injunctive relief, they have not established that such a risk of harm outweighs the risk of irreparable harm to FedEx Ground if the injunction issues and is later found to have been issued in error.

The court appraises the risk of irreparable harm to the parties not simply by reference to what they will lose by an unfavorable ruling today, but rather by reference to the harm of error: what irreparable harm would denial of a preliminary injunction cause to [the movant] and the public if the trial reveals that [the movant] is entitled to relief; and what irreparable harm will the granting of an injunction do to [the opponent] and the public if the trial reveals that [the movant] is not entitled to relief? Once those evaluations are made, the court balances likelihood of success and the risk of irreparable harm on a sliding scale: the better a party's chances of winning at trial, the less the balance of harms needs to favor that party.

*AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 831 (7th Cir.2002).

The *Estrada* appellate decision indicates that continuation of the pre-"California Transition" model might subject FedEx Ground to damages awards. Such awards would themselves be compensable by damages, but could outgrow the plaintiffs' ability to pay them; certainly this record affords the court no basis on which to determine the amount of the bond the plaintiffs would be required to post as a condition of preliminary injunctive relief. *See Mead Johnson & Co. v. Abbott Labs.,* 201 F.3d 883, 888 (7th Cir.2000) ("When setting the amount of security, district courts should err on the high side.... Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.").

Further, uncertainty as to the status and future of SWA contractors would menace FedEx Ground's ability to maintain a stable work force in its heaviest business season, threatening incalculable damages to FedEx Ground's till, good will, and future business.

The balance of the harms greatly favors FedEx Ground and disfavors issuance of the requested injunction.

III

For all of these reasons, the court DENIES the plaintiffs' motion for temporary restraining order and preliminary injunction [docket # 878].

SO ORDERED.

N.D.Ind.,2007.
In re FedEx Ground Package System, Inc. Employment Practices Litigation
Not Reported in F.Supp.2d, 2007 WL 3036891 (N.D.Ind.), 13 Wage & Hour Cas.2d (BNA) 924

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit G



**H**Only the Westlaw citation is currently available.

United States District Court, W.D. Washington,
at Tacoma.
Sharonda BELL, Plaintiff,
v.
ADDUS HEALTHCARE, INC., Defendant.
**No. C06-5188RJB.**

Sept. 19, 2007.

James Dana Pinney, Meike B. Chase, Susan C. Nel-
son, Bailey Pinney And Associates LLC, Vancouver,
WA, for Plaintiff.

Holly M. Hearn, Carol J. Bernick, Michael Reiss,
Davis Wright Tremaine, Seattle, WA, for Defendant.

ORDER DENYING WITHOUT PREJUDICE
PLAINTIFF'S MOTION TO LIMIT CONTACT
WITH PUTATIVE CLASS MEMBERS
PURSUANT TO FRCP 23(d)

ROBERT J. BRYAN, United States District Judge.

**\*1** This matter comes before the court on the Plain-
tiff's Motion to Limit Contact With Putative Class
Members Pursuant to FRCP 23(d). Dkt. 181. The
Court has considered the pleadings filed in support of
and in opposition to the motion and the remainder of
the file herein.

### I. FACTUAL AND PROCEDURAL
### BACKGROUND

Plaintiff Sharonda Bell filed a complaint seeking
damages in excess of five million dollars on behalf of
a proposed class consisting of at least 100 members.
Dkt. 1 at 1. The complaint alleges that Defendant
Addus Healthcare, Inc. ("Addus") violated Washing-
ton and Oregon wage and hour laws. *Id.* 6-10.

On February 22, 2007, Addus filed a Motion for Or-
der Under Fed.R.Civ.P. 23(d) in re Communication
with Putative Class Members. Dkt. 93. On March 21,
2007, Plaintiff filed a response to that motion and

included a cross motion for class certification. Dkt.
98 at 10. The Court has re-noted the cross motion for
class certification three times and it is currently noted
for September 28, 2007. Dkt. 105; Dkt. 162; Dkt.
183. On April 4, 2007, the Court issued an Order
Denying Without Prejudice Defendant's Motion for
Order Under Fed.R.Civ.P. 23(d) in re Communica-
tion with Putative Class Members. Dkt. 109.

Ms. Bell now moves for an order limiting Addus'
contact with putative class members. Ms. Bell pro-
poses that the Court limit Addus' contact as follows:

1. Defendant must confer with Plaintiff's counsel at
   least 14 days before it communicates with putative
   class members regarding the matters in this case,
   and

2. Defendant must provide Plaintiff's counsel with the
   opportunity to be present should such contact oc-
   cur.

Dkt. 181-2 at 2.

This request was precipitated by Addus' counsel in-
terviewing its employees to obtain declarations for
the current suit. Addus claims that before counsel
proceeded with the interview it gave each employee a
disclosure statement that contained the following
statements:

• The individual(s) speaking with you is the legal
  representative of Addus and has been retained to
  defend the company in the lawsuit described
  above.

• The individual(s) is seeking to investigate facts in
  order to evaluate and defend against the lawsuit.

• You are under no obligation to speak with Addus'
  legal representative.

• Addus will take no adverse or retaliatory act against
  any employee who chooses not to speak with its
  legal representative.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2752893 (W.D.Wash.)
(Cite as: 2007 WL 2752893 (W.D.Wash.))

Page 2

- Addus will not reward any employee for choosing to speak to its legal representative.

- Addus has not promised you anything in exchange for your decision to speak with its legal representative.

- Any information you provide may be used in the lawsuit against Addus.

- Neither Addus, nor its legal representative, will attempt to influence your decision regarding whether you should "opt out" of the potential class action.

Dkt. 142 at 4.

On July 11, 2007, Addus submitted the declarations of its employees in support of its opposition to class certification. Dkt. 142-156. In Ms. Bell's reply brief for class certification, Ms. Bell moved to strike the declarations on the basis that the declarations were obtained as a result of coercion. Dkt. 166 at 3-6. On August 27, 2007, the Court issued an order denying Ms. Bell's motion to strike the declarations. Dkt. 182.

## II. DISCUSSION

**\*2** Under Federal Rule 23, courts have discretion to fashion orders governing class actions:

In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) **imposing conditions on the representative parties or on intervenors;** (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) **dealing**

**with similar procedural matters.**The orders may be combined with an order under Rule 16, and may be altered or amended as may be desirable from time to time.

Fed.R.Civ.P. 23(d)(emphasis added). Class actions present a potential for abuse, and courts therefore have both the duty and the authority to exercise control over the action and enter orders governing the conduct of parties and counsel. *Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981).* The Supreme Court has held that in the pre-certification phase, "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id. at 101.*The burden is on the moving party to demonstrate "the particular abuses by which it is threatened."*See id. at 102.*The order should also be "carefully drawn" and "limit[ ] speech as little as possible."*Id.*

Ms. Bell argues that the Court should limit Addus' contact with putative class members because Addus' previous contacts were abusive and coercive. Dkt 181 at 3. In support of her arguments, Ms. Bell has incorporated two declarations by reference: Declaration of Wendy Wersch ("Wersch Decl.") (Dkt.167) and Declaration of Jane Doe ("Doe Decl.") (Dkt.175). The Court issued an order striking the Doe Declaration for purposes of class certification. Dkt. 182 at 10. In Addus' response to this motion, it responded to the Wersch Decl. but not the Doe Decl. because the Court had "stricken the Jane Doe Declaration." Dkt. 184 at 2, n. 1. However, the Court ordered that the Doe Decl. was stricken on the basis that the submission of new evidence in a reply brief is improper. Dkt. 182 at 10. Ms. Bell is now referencing the Doe Decl. in support of this motion to limit Addus' contact with putative class members. Although the Doe Decl. was stricken as part of Ms. Bell's reply for class certification, Ms. Bell should not be precluded from using that declaration in support of this motion. The Court should consider both declarations for the purposes of this motion.

**\*3** The main issue in this motion is whether the Court should issue an order requiring Plaintiff's counsel to be notified and be present in the event that Defendant has further contact with putative class members. *See* Dkt. 181-2 at 2 (proposed protective order). How-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2752893 (W.D.Wash.)
 (Cite as: 2007 WL 2752893 (W.D.Wash.))

Page 3

ever, the Court is not persuaded that Addus used abusive or coercive practices during the interviews in question. For instance, even though Ms. Wersch claims she was ambushed and proceeded with the interview without an adequate explanation of her rights (Wersch Decl. at 2), Ms. Wersch initialed the disclosure statement informing her of the purpose of the interview and declaration. Dkt. 156 at 10. The information on the disclosure statement is not false or misleading. Further, Addus has a right to fully investigate the case. *See Gulf Oil,* 452 U.S. 89. Thus, without sufficient evidence that Addus is abusing its right to contact putative class members, Ms. Bell has failed to meet her burden to show particular abuses that necessitate a protective order.

Further, Ms. Bell argues that the narrow limitations she requests do not prohibit Addus from contacting putative class members. Dkt 185 at 4. However, it is the putative class members' right to have counsel present. Ms. Bell's counsel do not have a right to be present during such interviews. The Court should not issue an order requiring Addus to inform Ms. Bell's counsel of upcoming interviews.

In summary, the Court is aware that communication with potential class members by counsel may present a risk of abuse and prejudice. However, Ms. Bell fails to demonstrate that Addus' communications thus far warrant corrective action. The Court should therefore deny the motion without prejudice, allowing the parties to again raise the issue if future communications appear to warrant Court intervention.

### III. ORDER

Therefore, it is hereby

**ORDERED** that Plaintiff's Motion to Limit Contact With Putative Class Members Pursuant to FRCP 23(d) (Dkt.181) is **DENIED without prejudice.**

The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

W.D.Wash.,2007.
Bell v. Addus Healthcare, Inc.
Not Reported in F.Supp.2d, 2007 WL 2752893 (W.D.Wash.)

END OF DOCUMENT

Exhibit H



**H**Only the Westlaw citation is currently available.FOR ONLINE PUBLICATION ONLY

United States District Court,
E.D. New York.
In re VISA CHECK/MASTERMONEY
ANTITRUST LITIGATION.
No. CV-96-5238 (JG).

March 31, 2006.

Jeffrey Issac Shinder, Constantine Cannon, P.C., New York, NY, for Petitioner, Lead Counsel for the Plaintiff Class.

Wendy H. Schwartz, Reed Smith LLP, New York, NY, for Spectrum Settlement Recovery, LLC.

MEMORANDUM AND ORDER INCLUDING INJUNCTION

JOHN GLEESON, United States District Judge.

*1 In an application dated February 15, 2006, lead counsel for the plaintiff class, Constantine Cannon ("Lead Counsel"), moved for injunctive relief against Spectrum Settlement Recovery LLC ("Spectrum"), a claim filing and fund recovery service for commercial class actions. According to Lead Counsel, Spectrum has been using false and misleading statements to entice class members to retain Spectrum to administer their claims and, more recently, to purchase their claims outright.

For the reasons set forth below, the motion is granted.

*BACKGROUND*

A. The Settlements, the Plan of Allocation *and the Distribution of Settlement Funds*

In this antitrust action, a class of approximately five million merchants alleged, among other things, that defendants Visa U.S.A. Inc. ("Visa") and MasterCard International, Inc. ("MasterCard") illegally tied their debit products to their credit cards, in violation of the Sherman Act. On the brink of trial in June of 2003, the plaintiffs entered into settlement agreements with each of the defendants, providing for, *inter alia,* the creation of a $3.05 billion settlement fund. On December 19, 2003, I approved those agreements and the plan of allocation for distributing the settlement funds.

Annual payments are to be made by the defendants over a ten-year period. The plan of allocation (which was amended in August 2005 and is referred to here as the "Amended Plan") sets forth a method for estimating the damages of each class member and allocating settlement funds accordingly. Class members are to receive monetary awards that are directly proportional to their debit and credit purchase volume (as well as online debit transactions) [FN1] during the class period, *i.e.,* from October 25, 1992 to June 21, 2003. The deadline for submitting claims was December 28, 2005 for the vast majority of the class.

> FN1. The allocation system uses a different method of calculation for off-line debit and credit card charges than it does for calculating on-line debit charges, and also distinguishes between those merchants who appear in the Visa Transactional Database, which includes extensive records of credit and debit card transactions between October 1996 and July 2003, and those who do not. See Nov. 2, 2005 R & R at 6-11.The differences in calculation methodology are not material to the issue presently before me.

The first round of payments will be mailed out on a rolling basis. The remainder of the allocation process will depend on whether the settlement funds are reduced to a lump sum, either through securitization or through pre-payment by one or both of the defendants. If the funds are reduced to a lump sum, each claimant will receive a second check payable in the amount designated by the claims administrator on a pro rata basis. Amended Plan, Section 12.1. Lead Counsel estimate that no pro rata payments will be made prior to the end of 2007. Tr. at 4-5.[FN2]If the funds are not reduced to a lump sum, multiple payments may be made to class members through 2013. In that event, the claims administrator will apply each

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2006 WL 1025588 (E.D.N.Y.)
**(Cite as: 2006 WL 1025588 (E.D.N.Y.))**

merchant's pro rata share of the total damages to the portion of the settlement funds received in any year to determine the amounts to be sent annually to class members. Amended Plan, Section 12.2.

> FN2. Citations in the form Tr. at ____ refer to the transcript of the oral argument held on Feb. 22, 2006.

Finally, if additional settlement funds remain after all approved claims have been paid, an additional pro rata distribution may be paid to all class members who received and cashed their checks. Amended Plan, Section 12.5.

### B. *Spectrum*

**\*2** Spectrum describes itself as the nation's largest claim filing and fund recovery service for commercial and securities class action settlements. For a fee, it acts as an administrator of a merchant's claim to participate in the settlement. Its contracts with merchants that provide for this service are referred to here as "agency contracts." Beginning in mid-December 2005, it expanded its service to the class members in this case to include the outright purchase of the merchants' claims, pursuant to contracts referred to here as "claim purchasing contracts." As of March 1, 2006, about 4,800 merchants had entered into agency contracts with Spectrum. Three had agreed to claim purchasing contracts.

### C. *The Earlier Misrepresentations by Spectrum*

This is the second time Lead Counsel have sought relief based on statements by Spectrum to class members. The first such application was filed on September 9, 2005. In that application, Lead Counsel accused Spectrum of using fraudulent and misleading solicitations to entice class members to execute agency contracts. Spectrum was accused of "intentionally spreading misinformation to confuse Class members and complicate the allocation process in an attempt to create a need for its services."Dec. 13, 2005 Order. At that time, Lead Counsel sought, among other things, a declaration that any contracts between Spectrum and class members were void and an injunction prohibiting Spectrum from soliciting class members and requiring it to correct the misstatements it made to class members.

I referred that application to Special Master Robin M. Wilcox, who, in a report dated November 2, 2005, found that the following statements made by Spectrum in its communications with class members were incorrect or misleading: (1) that the Visa Transactional Database failed to distinguish between credit card and off-line debit transactions; (2) that class members "may be eligible to collect significant top line revenue from $100,000 to $6,000,000;" (3) that the claims administrator would become "adversarial" with respect to the merchants and "is obligated to rely only on the questionable information provided by MasterCard and Visa;" and (4) that the estimated cash payment sent to class members was an "offer" or "partial offer." Nov. 2, 2005 R & R at 24-29.

I adopted Special Master Wilcox's findings and her recommendation that I refrain, at that time, from granting the injunctive relief against Spectrum that Lead Counsel had requested. However, Lead Counsel were directed to (1) publish a notice on the case website correcting Spectrum's statements; and (2) send the same corrective notice to all class members with whom Spectrum had communicated. A copy of that notice is attached hereto as Appendix B. I directed further that the notice be sent, in effect, at the expense of the settlement fund, without prejudice to a renewed application by Lead Counsel to impose the costs on Spectrum after the mailing had been completed and upon a demonstration of the actual costs incurred. *See* Dec. 13, 2005 Order.

### D. *The Misrepresentations Now Alleged*

**\*3** On February 2, 2006, the *Wall Street Journal* reported that the United States government had filed a claim to participate in the settlement. The article asserted that the government's claim could be worth as much as $100 million, and that Lead Counsel had expressed serious concerns about the government's eligibility to participate in the settlement.

In the instant motion, Lead Counsel assert that "Spectrum is once again using misrepresentations-this time that the U.S. government's potential claim will delay payments to class members-to gin up business."Lead Counsel's Feb. 15, 2006 Mem. at 2. According to Lead Counsel, the resolution of the United States' claim will have no impact on the processing of the claims currently pending before the claims adminis-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

trator. *Id.* at 2-3.Rather, the government's claim would at most impact the pro rata distribution, which, as mentioned above, Lead Counsel estimates will take place no earlier than late 2007. Tr. at 4-5.

Since my order of December 13, 2005, Spectrum's e-mail and written solicitations have included the following statements, all of which Lead Counsel assert are false and/or misleading:

• "the government has filed a hefty claim (100 mil) and that [sic] push back the payout date as well and affect the residual."Shinder Decl. Ex. F; Contaxes Decl. Ex. B.

• "[b]ecause there's a set amount of money to be distributed to the class as a whole, the government's claim, if validated, will reduce the amount of your recovery."Contaxes Decl. Ex.. A (emphasis in original).

• "the claim by the government for $100 million is going to delay" payment to the merchants. Zola Decl. Ex. A.

• "the federal government has entered into the picture, which may cause distributions to be delayed."Shinder Decl. Ex. F.

• "[i]f the legal proceedings related to the U.S. Government's eligibility continue we should expect to see some further delay in the payment dates to the class."Schwartz Decl. Ex. C.

• "[n]ow that the Federal government is a claimant any further delays should come as a surprise to no one, especially in light of the unprecedented size of the class, the complexity of the Plan of Allocation, and the resistence of Lead Counsel to the Fed's participation as reported in the attached WSJ article."Schwartz Decl. Ex. D.

• "securitization of the settlement funds has not yet occurred, which may cause distributions to be delayed."Shinder Decl. Ex. F.

Lead Counsel argue that these statements are misleading and are part of a deliberate campaign by Spectrum to convince class members that their distributions from the settlement funds face lengthy delays

in order to induce them to immediately sell their claims to Spectrum. They seek (1) an order requiring Spectrum to send a corrective notice at its own expense; and (2) an order providing class members who were misled by Spectrum's solicitations the right to void their contracts with Spectrum.

**\*4** For the reasons stated below, Lead Counsel's motion is granted. Spectrum's application for a stay of the relief is denied.

*DISCUSSION*

A. *The Court's Power*

In response to Lead Counsel's first application, Spectrum asserted that this Court lacked subject matter jurisdiction "to ... void individual contracts already agreed between Spectrum and individual merchants."Nov. 2, 2005 R & R at 13.Special Master Wilcox disagreed, concluding that "this Court has subject matter jurisdiction to order [injunctive] relief."*Id.* at 30.Over Spectrum's objection to this conclusion, I adopted the Special Master's report, including the recommendation that I not exercise the authority by ordering the injunctive relief sought by Lead Counsel at that time. Dec. 13, 2005 Order.

Spectrum now reiterates the argument. There is no jurisdiction to grant the relief sought, Spectrum argues, because "such contracts and disputes do not affect this Court's ability to administer the settlement and distribute the settlement funds."Mar. 1, 2006 Schwartz Reply Letter at 2. I disagree.

The All Writs Act, 28 U.S.C. § 1651(a) (1982), does not itself create jurisdiction, *see Stephenson v. Dow Chem. Co., 346 F.3d 19, 21 (2d Cir.2003)* (citing *Syngenta Crop Protection, Inc. v. Henson, 537 U.S. 28 (2002)*), but it authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *U.S. v. New York Tel. Co., 434 U.S. 159, 172 (1977).*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Where, as here, a district court retains exclusive jurisdiction over settlement agreements and distribution of settlement funds pursuant to those agreements, it may issue orders necessary to protect the settlement from threats by both parties and non-parties. *See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litigation), 770 F.2d 328, 336 (2d Cir.1985)* ("the findings of the district court that the injunction was necessary to preserve its jurisdiction and protect its judgments, if sustainable, would be sufficient to justify the issuance of the injunction under the All-Writs Act."). Spectrum's argument that this jurisdiction does not extend to its communications and contracts with class members is unpersuasive.

I have presided over this action since 1996. With the express consent of all parties, I played an active role in the settlement discussions and have maintained an active role in the administration of the settlement. I recognize that Spectrum and firms like Spectrum can provide a valuable service to class members who seek assistance in filing their claims or wish to liquidate those claims. Such firms are a natural and welcome feature of the settlement landscape. But this is not a run-of-the-mill business environment, subject solely to market forces and the principles of contract and tort law that control behavior in that environment. The fact that the merchant class is huge does not alter the nature of the Court's relationship with its members. The settlement of a long, hard-fought case has given those class members a tangible interest in settlement funds. I have an affirmative obligation to protect those interests. If a merchant chooses to sell its claim or pay someone else to process its claim, that is fine with the Court. It is also fine for firms like Spectrum to solicit merchants to use their claim processing or claim purchasing services. The nature of the Court's interest is as simple as it is strong: the class members must not be misled. Where false or misleading statements are used to solicit business from them, I have no intention to sit by and relegate them to a cause of action for breach of contract or fraud. To do otherwise-that is, to say that I am powerless to take steps, both proactive and reactive, to protect each class member's interest in the settlement funds, even when I know they are being misled-would be an abdication of responsibility. It would also erode the class members' and the public's respect for the settlements themselves, and for the process that produced them.

**\*5** Because Spectrum's contracts with class members plainly affect the administration of the settlements and the distribution of the settlement funds, the All Writs Act authorizes the relief sought by Lead Counsel.[FN3] "The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *U.S. v. New York Tel. Co., 434 U.S. 159, 174 (1977).See also In re Chambers Development Co., Inc., 148 F.3d 214, 223 n. 6 (3d Cir.1998); In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation, 369 F.3d 293, 297 (3d Cir.2004); In re Baldwin-United Corp., 770 F.2d at 328.*

> FN3. The Second Circuit has held that Fed.R.Civ.P. 23(d), like the All Writs Act, does not create independent substantive rights or remedies enforceable in federal court. *See In re Baldwin-United, 770 F.2d at 335.* While **Rule 23( d)** may preserve jurisdiction in the context of administering a settlement agreement (also like the All Writs Act), I need not decide that question here. *See Georgine v. Amchem Products, Inc., 160 F.R.D. 478, 498 (E.D.Pa.1995)* (finding that Rule 23 enables courts to enter remedial orders in the conduct of class actions without a finding of actual harm: "[a] remedy is **appropriate** if the communications at issue create a 'likelihood' of abuse, confusion, or an adverse effect on the administration of justice."(citations omitted)).

In sum, I conclude that this Court has even greater authority than that necessary to grant the relief sought by the instant motion. It may prohibit communications with class members entirely, compel communications correcting misleading statements, and declare contracts between third parties and class members void. *See, e.g., In re McKesson HBOC, Inc.,* 126 F.Supp. 1239, 1242 (N.D. Ca 2000); *In re Synthoid Marketing Litig., 197 F.R.D. 607, 610 (N.D . Ill.2000).* It is certainly within this Court's power, therefore, to order that the contracts in question are voidable at the option of the merchants. The only

question is whether, on the facts presented, such re-
lief is appropriate.

B. *The Disputed Statements*

The statements at issue relate primarily to the effect
the government's claim to a portion of the settlements
funds will have on the timing of payments to class
members. As discussed below, a common sense read-
ing of Spectrum's marketing materials and e-mails
would easily lead a member of the plaintiff class to
believe that there will be a significant impact on the
timing of all payments by the claims administrator-
including the initial payment. In fact, the initial pay-
ments to class members will not be affected at all,
either in amount or in the timing of payment. The
timing of any subsequent, pro rata distributions will
not likely be affected. The amount of those subse-
quent payments could be affected if the government's
claim is allowed, but the outcome of that claim is
speculative at best.

On February 3, 2006, a Spectrum settlement special-
ist sent an e-mail solicitation to up to 300 class mem-
bers. The subject was "This can push back the pay-
ment date on your claim-good article in WSJ." The
text of the e-mail, which included an offer to pur-
chase the merchants' claims, stated that it "[l]ooks
like the Government has filed a hefty claim (100 mil)
and that (sic) push back the payout date as well and
affect the residual."Shinder Decl., Ex. F. A reason-
able merchant could obviously read that e-mail as a
statement by Spectrum that the government's claim
will delay both the initial payment to the merchant
and the subsequent residual payments as well. No one
disputes that such a statement would be wrong.

**\*6** Spectrum says that Lead Counsel is complaining
about a mere "typographical error," *i.e.,* the sender of
the e-mail "exclud[ed] the word 'could' before 'push
back the payout date as well and (sic) the residual.' "
Spectrum Mem. at 10 n. 6. Though Spectrum seems
to regard its mistake as inconsequential, I do not. A
merchant reading the e-mail for its common sense
meaning could conclude (erroneously) that the initial
payment will be delayed and decide, on that errone-
ous basis, to contract with Spectrum, either to admin-
ister the merchant's claim or to purchase it.[FN4]It is
hardly unreasonable to expect-and indeed require-
Spectrum to get the facts right when it solicits busi-
ness from class members. If it fails to do, through

"typos" or otherwise, Spectrum will bear the cost of
its errors.[FN5]

> [FN4.] On February 9, 2006, a class member
> e-mailed the claims administrator, stating
> that "Spectrum settlement is stating that the
> claim by the government for $100 million is
> going to delay our payment, so we should
> take Spectrum's offer to be paid now. Is this
> true?"Zola Decl. ¶ 2 & Ex. A.

> [FN5.] Even with the inclusion of the qualifier
> Spectrum says was inadvertently omitted,
> Spectrum's written solicitations would erro-
> neously suggest that the *initial* payments to
> merchants might be delayed by the govern-
> ment's potential claim.

Spectrum's other marketing materials are misleading
as well. An attachment to widely distributed e-mails,
entitled "The Unpredictable Nature of Your Pay-
ment," states that, as a result of the government's
claim, "we should expect to see some further delay in
the payment dates to the class."Schwartz Decl. Ex. C.
But that is not true; as mentioned above, there will be
*no* delay in the initial payments. Spectrum admitted
its mistake at oral argument and offered to correct it.
Tr. at 14.

In further defense of that and other statements warn-
ing of delayed payments,[FN6] Spectrum asserts that it
treats all payments to the merchants "as a whole." Tr.
at 18; *see also* Spectrum Mem. at 11. "[W]e don't
ever talk about just the initial payment when we talk
about purchasing a claim from someone," Spectrum's
general counsel asserted at oral argument. Tr. at 18.
Thus, Spectrum suggests, if there is a prospect that a
residual payment may be delayed years from now, it
is appropriate for Spectrum to warn merchants to
expect delays in the payments due to the class.

> [FN6.] The "Unpredictable Nature of Your
> Payment" solicitation includes three separate
> assertions about delays in payment.

I reject that suggestion. Spectrum may consider the
multiple payments to each merchant as a whole, but
the merchants may not, and Spectrum has no right to
hide its assumptions from the class members. It must
be more careful. If the initial payment will not be
affected by the government's claim, Spectrum cannot

Case 2:07-cv-00418-ADS-ETB   Document 219   Filed 07/31/09   Page 37 of 63 PageID #: 1579

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2006 WL 1025588 (E.D.N.Y.)
 **(Cite as: 2006 WL 1025588 (E.D.N.Y.))**

suggest otherwise.

At oral argument, Spectrum acknowledged that even the residual payment may not be affected by the government's claim. Tr. at 12 ("[w]e can't know whether or not the back end payment is going to be delayed."). If the government successfully asserts a claim, it is conceivable that each merchant's share of the settlement funds may be affected, but any effect on the timing of those payments remains entirely speculative.

In short, as Spectrum concedes, it was "not as careful with the wording" of its communications to class members as "[the Court] would have liked." Tr. at 18. Spectrum must now be held accountably for its carelessness.

C. *The Appropriate Relief*

1. *The Corrective Notice*

At oral argument on February 22, 2006, I directed Lead Counsel and Spectrum to try to agree upon the content of a corrective notice and to whom it should be sent. To their credit, they have done so, agreeing on a form of corrective notice to be sent to every class member who has been solicited by Spectrum to sell its claim to Spectrum. The corrective notice, in the form agreed to by Lead Counsel and Spectrum, is attached as Appendix A. It shall be sent to those class members by Lead Counsel and posted on the case web site.

2. *Spectrum's Voluntary Commitments*

**\*7** In a laudable attempt to prevent similar errors from being made in the future, Spectrum has voluntarily agreed to: (1) provide the corrective notice to any class member prior to the execution of a claim purchase contract; (2) include in all additional claim purchasing contracts the right to rescind the agreement for any reason within 14 days of execution; (3) meet and confer with Lead Counsel at least two days prior to the dissemination of any additional marketing materials; and (4) cease to mention the Wall Street Journal article and/or the potential claim by the United States government until such time as the issue is resolved in a way that may affect the timing or quantum of the distribution of funds to class mem-

bers.

These commitments will help ensure that class members are receiving complete information. Spectrum is therefore expected to comply with them.

3. *Voidability of Contracts*

Lead Counsel asserts that additional remedial action beyond the corrective notice is necessary to protect the rights of the approximately 4800 class members who have entered into agency contracts and the much smaller number (only three as of February 22, 2006) who have entered into claim purchasing contracts. Those class members, Lead Counsel argues, "feel they are held hostage to their agreement with Spectrum [and] need additional relief from the Court."Mar. 1, 2006 Shinder Letter at 1-2. After the initial corrective notice was sent pursuant to my order dated December 13, 2005, Lead Counsel "heard repeatedly from Class Members ... who have expressed concerns about legal ramification from Spectrum should they wish to rescind their agreement."*Id.* at 1.

Spectrum argues that I do not have the authority to issue such an order. As discussed above, I disagree. It further argues there must be an individual showing of actual reliance-subject to challenge by Spectrum-by any class member wishing to void a contract before I can order that contract voidable. At oral argument on February 22, 2006, I implied as much. *See* Tr. at 26-27. Upon further reflection, however, I believe that equity requires that class members be authorized to rescind their contracts without having to litigate reliance, provided they state under oath that they entered into their contract with Spectrum in reliance on its false or misleading statements.

First, requiring Spectrum to allow the merchants to rescind their contracts simply directs Spectrum to do what it says it will do anyway. Spectrum asserted at oral argument that it is willing to voluntarily void contracts at merchants' request. Tr. at 22-23 ("we let [class members] know that if they didn't want to use us as agent anymore that we would let them out of their contracts."); *see also* Mar. 1, 2006 Schwartz Reply Letter at 2 ("32 class members have approached Spectrum seeking relief from their contract, and Spectrum has acceded to each such request").

Second, given its repeated dissemination of false and

misleading information, it would be both unfair and inefficient to permit Spectrum to challenge a merchant's claim of reliance. The prospect of such litigation would no doubt cause some merchants who in fact relied on the misstatements to refrain from seeking to void their contracts. Indeed, that concern has already been expressed by some merchants to Lead Counsel in the wake of the first corrective notice. I acknowledge a small risk that a *non* relying merchant might seek to rescind, but I have little difficulty imposing that risk on Spectrum, which has created it by twice disseminating bad information in its zeal to generate business.

**\*8** I conclude that any class member who has entered into either an agency or a claim purchasing contract with Spectrum may void that contract by stating in a notarized document addressed to Spectrum and copied to Lead Counsel that it that relied on misleading marketing materials in entering the contract. The letter must be postmarked within 30 days of the merchant's receipt of the notice of their right to void their contracts. Spectrum and Lead Counsel are directed to confer and, if possible to reach agreement on the form of that notice. The notice shall contain a form the recipient may use to exercise the right. Any dispute in that regard shall be brought to my attention by no later than April 11, 2006.

My decision does not abridge Spectrum's right "to question and challenge elements of the settlement," Schwartz letter dated March 1, 2006, at 1, or require it "to vet everything [it says to the class] through Lead Counsel or the Court."Tr. at 17. It requires only that Spectrum not make false or misleading statements when it solicits the business of class members. I expect that of everyone. Those who fail to abide by that simple rule will be held accountable.

Finally, I believe the rights of the class members will be prejudiced by the imposition of a stay of the relief ordered here. Thus, Spectrum's motion for a stay is denied.

*CONCLUSION*

For the foregoing reasons, it is hereby ordered as follows:

1. Lead Counsel shall send the corrective notice (Appendix A) to all class members who have received

Spectrum's solicitations to enter claim purchasing contracts as soon as practicable. The same notice shall be posted on the case website.

2. On or before April 21, 2006, Lead Counsel shall mail to all class members who have entered into contracts with Spectrum a notice that the contract may be voided by the merchant without legal ramification in the manner and within the time period prescribed above;

Spectrum's application that I defer ruling on Lead Counsel's request for costs and attorney's fees is granted. Such an application, as well as Lead Counsel's renewed application for costs and fees incurred in connection with the first corrective notice, shall be directed in the first instance to Special Master Wilcox. Any such application shall separately identify and calculate disbursements and attorneys fees.

So Ordered.

E.D.N.Y.,2006.
In re Visa Check/Mastermoney Antitrust Litigation
Not Reported in F.Supp.2d, 2006 WL 1025588 (E.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit I



Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)
 **(Cite as: 2001 WL 1035132 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
RALPH OLDSMOBILE INC., on behalf of itself and
all others similarly situated, Plaintiff,
v.
GENERAL MOTORS CORPORATION, **Defendant.**
**No. 99 Civ. 4567(AGS).**

Sept. 7, 2001.

*MEMORANDUM ORDER*

SCHWARTZ, J.

**\*1** Plaintiff moves, pursuant to Fed.R.Civ.P. 23, for an order requiring defendant "to cease and desist its practice of obtairting *exparte* releases from putative Class members," voiding those releases already obtained, and requiring defendant "to send a Court-approved corrective notice" that any such releases have been voided.[FN1] As set forth more fully below, the motion is granted in part and denied in part.

> FN1. Plaintiff also sought the name and address of each dealer who signed a release after this action was filed. Because defendant has provided that information (Aff. of Charles F. Seaburg dated July 11, 2001 ("Seaburg Aff.") Ex. A), this portion of the motion is denied as moot.

I. Background

Plaintiff Ralph Oldsmobile Inc. ("Ralph Olds") filed this purported class action on behalf of all franchised General Motors dealers in New York State. Ralph Olds alleges that defendant General Motors Corporation ("GM") violated New York Vehicle and Traffic Law § 465 ("VTL § 465"), which requires that franchisor car manufacturers reimburse their franchised dealers for warranty repairs at not less than market rates. According to Ralph Olds, GM paid its franchised dealers less than the statutory rate for parts used in warranty repairs. (*See generally* Am. Compl.) On September 29, 2000, the Court denied GM's mo-

tion for summary judgment, 2000 WL 1459767, and on January 23, 2001 denied GM's motion for reconsideration or, in the alternative, for leave to proceed with an interlocutory appeal. 2001 WL 55729. Familiarity with those decisions is assumed herein. On January 29, 2001, the Court issued an order allowing plaintiff's counsel to send a notice to all putative class members, responding to a letter sent to GM dealers by another law firm (which letter allegedly included misrepresentations about this action).

While this action has been pending, GM announced that it will discontinue its Oldsmobile line. (Seaburg Aff. ¶ 2.) In connection with the discontinuance, GM has offered Oldsmobile dealers throughout the country certain transition payments, above and beyond what GM is required by its dealer contracts to pay for termination of Oldsmobile dealerships. (*Id.* ¶¶ 2-4.)To obtain these transition payments, an Oldsmobile dealer must sign a termination and release agreement. (*Id.* ¶¶ 5-6.)The agreement provides, in relevant part, that the dealer releases all Oldsmobile-related claims against GM except, *inter alia,* claims relating to "reimbursement to Dealer of unpaid warranty claims for warranty services performed by Dealer within six (6) months prior to the effective date of termination...." (Aff. of Lester L. Levy in Support of Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief dated June 27, 2001 ("Levy Aff.") Ex. B at 2.) Plaintiff sent a letter to defendant voicing concern about the releases, and requesting the exact language of the release and information about dealers who had signed releases. (Levy Aff. Ex. A.) Defendant provided the release language, refused to identify the dealers who had signed releases, and asserted that plaintiff's January 2001 notice had advised putative class members of their rights. (Levy Aff. Ex. B.) Plaintiff replied that it considers improper GM's offering this release without referring to this action and without informing dealers of the fact that dealers signing the release may have waived or limited their rights in this action. Plaintiff requested that GM stop obtaining such releases and treat all previously obtained releases as null and void. (Levy Aff. Ex. C.) GM did not agree to this request. Plaintiff then filed the instant motion.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:07-cv-00418-ADS-ETB   Document 219   Filed 07/31/09   Page 41 of 63 PageID #: 1583

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)
**(Cite as: 2001 WL 1035132 (S.D.N.Y.))**

II. Discussion

*2 The Supreme Court has held that Rule 23 allows a court, in appropriate circumstances, to restrict communications between a party and members of a class or putative class. *Gulf Oil v. Bernard,* 452 U.S. 89 (1981). Acknowledging the possibility of abuses in class action litigation, but seeking to avoid infringing parties' rights, the Supreme Court held that:

an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.... In addition, such a weighing-identifying the potential abuses being addressed-should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Id.* at 101-02 (footnotes omitted). Although *Gulf Oil* concerned communications between counsel for the named plaintiff and potential class members, its rationale has been found to apply to communications between defendants and potential class members as well. *See, e.g., Bublitz v. E.I. DuPont de Nemours & Co.,* 196 F.R.D. 545, 547 (S.D.Iowa 2000); *Abdallah v. Coca-Cola Co.,* 186 F.R.D. 672, 675 n. 1 (N.D.Ga.1999).*Gulf Oil,* and a court's power to restrict communications between parties and potential class members, apply even before a class is certified. *See, e.g., Bublitz,* 196 F.R.D. 545; *Burrell v. Crown Cent. Petroleum, Inc.,* 176 F.R.D. 239, 242-43 (E.D.Tex.1997).

Ralph Olds contends on this motion that the Court should restrict GM's communication with members of the putative class because GM's unilateral obtaining of releases is abusive. Specifically, Ralph Olds contends that GM's communications with Oldsmobile dealers are coercive and do not provide adequate information about the rights waived by the releases. (Mem. of Law in Supp. of Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief at ("Pl.'s Mem.") 6-11.) GM responds that it is entitled to settle with individuals prior to class certification, that there is no coercion, and that there is no evidence that any dealer has waived its rights unknowingly or involuntarily. GM

further argues that the relief sought by plaintiff is overbroad, but offers to add a minimal notice about this litigation to its agreements with Oldsmobile dealers in New York. (Opp. of Def. General Motors Corp. to Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief ("Def.'s Mem.") at 7-16.) In reply, plaintiff acknowledges that Second Circuit precedent authorizes GM to settle with individuals who may potentially be class members, but states that GM is acting improperly because it is obtaining releases without properly disclosing what is being released and without providing adequate consideration for the released claims. Plaintiff also rejects GM's proposed notice as inadequate. (Reply Mem. of Law in Supp. of Pl. Ralph Oldsmobile Inc.'s Mot. to Enjoin General Motors Corp. from Obtaining *ex parte* Releases from Putative Class Members and Other Relief ("Reply Mem.") at 3-13.)

*3 The record supports findings of potential abuse in GM's communications with Oldsmobile dealers regarding the releases. Specifically, the record supports findings of potential coercion and potentially unknowing waivers of the rights asserted in this action. The record does not support a finding of lack of adequate consideration. As to coercion, "[a] unilateral communications scheme ... is rife with potential for coercion. '[I]f the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive." ' *Kleiner v. First Nat'l Bank,* 751 F.2d 1193, 1202 (11th Cir.1985). In *Kleiner,* the Eleventh Circuit agreed with the district court that it was coercive for the defendant bank to call borrowers who were potential class members and ask them to opt out of the litigation. The Eleventh Circuit noted that many of the potential class members were not only current borrowers, but might depend upon the bank for future financing, might need "discretionary financial indulgence from their loan officers" and might not have easy access to other sources of credit. *Id.* Similarly, the court found coercion in a continuing business relationship in *Hampton Hardware, Inc. v. Cotter & Co.,* 156 F.R.D. 630 (N.D.Tex.1994). In that case, one retail hardware store filed a purported class action against a member-owned hardware wholesaler, of which the retailer was one member-owner. The wholesaler sent three letters to all of its Texas members, who were also the potential class members. The letters denigrated the suit, claimed it

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)
(Cite as: 2001 WL 1035132 (S.D.N.Y.))

would cost the wholesaler (and therefore its members-owners) substantial sums, and asked potential class members not to participate. *Id.* at 631-32. Citing *Kleiner,* the court found a potential for coercion. The court noted that potential class members relied upon the defendant for information and for low prices on hardware. As such, the court found the potential class members "particularly susceptible to believing defendant's comments that the lawsuit [would] cost them money." *Id.* at 633.

*Hampton Hardware* was distinguished, however, by the court in *Jenifer v. Delaware Solid Waste Auth.,* Nos. CIV.A 98-270 MMS, CIV.A 98-565 MMS, 1999 WL 117762 (D.Del. Feb. 25, 1999). In *Jenifer,* solid waste haulers filed putative class actions challenging regulations implemented by the defendant. The regulations required the plaintiffs to dispose of waste in Delaware, where disposal fees were higher than in other states. Plaintiffs contended that the defendant contacted potential class members and offered them a new pricing plan. Under this plan, the regulations would be eliminated and fees in Delaware would remain at then-current rates. However, potential class members who signed a three-year contract to dispose of their waste in Delaware, and agreed to release defendant from any liability relating to the regulations, would receive a substantial rebate on their disposal fees. *Id.* at *1. The court acknowledged that an ongoing business relationship may give rise to coercion, citing, *inter alia, Kleiner* and *Hampton Hardware. Id.* at *4. The court noted that "where there is a relationship that is inherently coercive, the court does not need to make a finding that a particular abuse has occurred.... The court, however, must still require a clear record of threatened abuses."*Id.* On the record presented, the court did not find coercion. It could not conclude that the pricing plan was or was not formulated in response to the lawsuit. It could not conclude that potential class members would be threatened into abandoning their claims. Unlike the letters in *Hampton Hardware,* which pertained solely to the lawsuit, the communications about the pricing plan "relate[d] to a business proposition which potential class members are free to reject if they decide the costs outweigh the benefits."*Id.* at *5. Accordingly, the court refused to forbid the defendant from communicating with potential class members. However, the court did order defendant to notify potential class members of the pendency of the lawsuit before they agreed to the release included in the pricing contracts. *Id.* at 7-8.[FN2]

FN2. Courts have reached different conclusions about whether an employer-employee relationship is sufficiently coercive to warrant restrictions on communication between a defendant and potential class members. *Compare Bublitz,* 196 F.R.D. 545 (restrictions imposed) *and Abdallah,* 186 F.R.D. 672 (same) *with Burrell,* 176 F.R.D. 239 (no restrictions imposed) *and Matarazzo v. Friedly Ice Cream Corp.,* 62 F.R.D. 65 (E.D.N.Y.1974) (stating that is is a better practice to have releases from potential class members pre-approved by court but not requiring approval nor precluding defendant from communicating with potential class members).

**4** While the instant action appears somewhat similar to *Jenifer,* a finding of potential coercion is warranted here. Concededly, there is no finding of actual coercion; and Oldsmobile dealers can refuse to sign the release, choosing to forgo the transition payments in favor of the combination of termination payments under the dealer agreement and the potential for damages in this action. (*See* Seaburg Aff. ¶¶ 2-8.) Also, as GM argues (Def.'s Mem. at 9), its communications about the transition payments do not relate solely to this action. However, the relationship between the parties here is distinguishable from that in *Jenifer.*Here, as in *Kleiner* and *Hampton Hardware,* the potential class members depend upon the defendant for information, supplies, and credit. (*See, e.g.,* Aff. of Celeste Dorsey-Grooms Submitted in Supp. of Mot. of Def. General Motors Corp. for Summ. J. dated Sept. 29, 1999, Ex. A.) Like the borrowers in *Kleiner* who had no other source of credit, the GM dealers have no other source of GM vehicles. (*Id.*) This is important because some of the dealers who have already signed releases sell not only Oldsmobiles, but other GM lines as well. (Seaburg Aff. ¶ 9, Ex. A.) Their continued success and, indeed, existence may depend upon GM's good will. The record, therefore, presents the clear potential for abuse.

The record also warrants a finding of a potential for unknowing waivers resulting from a lack of information. Although the release purports to waive a dealer's claims for unpaid warranty claims that are more than six months old, the release does not mention this action. (Levy Aff. Ex. B at 2.) Nor does the record re-

flect any mention of this action in any other communications made to date by GM regarding the transition payments. There is thus a risk that dealers may sign the release without knowing what they are releasing. Such an unknowing release would be abusive and warrant relief. GM contends that the notice sent by plaintiff to potential class members, and the letter to which it was responding, advised all potential class members of this action. (Def.'s Mem. at 11.) There is no evidence, however, as to whether any particular dealer received that notice or read it. Moreover, as plaintiff points out, the notice from plaintiff states that, because this is putatively a class action, dealers need do nothing to preserve their rights under VTL § 465. (Reply Mem. at 11-12.) Such language may lead dealers who read the notice to think that the release does not affect their claims under VTL § 465. GM also argues that former named plaintiff John Martin Motors signed a release agreement. (Def.'s Mem. at 6-7, 11.) What John Martin Motors knew or did, however, is not necessarily indicative of what any other dealer knew or did. Finally, GM offers to provide certain notice "in order to avoid the remote possibility that dealers will unknowingly waive claims."(Def.'s Mem. at 16.) Even in *Jenifer,* where the court found no coercion, the court did express concern about releases possibly granted without adequate notice and did order notice. The record sufficiently supports a finding of potential unknowing waivers.

*5 The record does, however, support a finding as to the presence of consideration for the releases. Ralph Olds argues in its reply memorandum that because the transition payments are the same in New York as they are in every other state, no consideration is being paid for the warranty claims that are being waived. (Reply Mem. at 5-7.) However, Ralph Olds assumes more than is justified by the record. Certain states other than New York have statutes that require manufacturers to reimburse dealers for warranty repairs. *See, e.g.,* 2000 WL 1459767, at *6. While this Court's prior decisions in this action distinguish those statutes from VTL § 465, 2000 WL 1459767, at *6; 2001 WL 55729, at *2, those statutes do provide dealers in other states with certain rights. The record contains no information as to what actions may or may not be pending in other states under those states' analogs to VTL § 465. Whether or not any such actions are pending, dealers in other states are waiving their rights under applicable warranty reimbursement statutes to the same extent, if any, that dealers in New

York are waiving their rights under VTL § 465. (Seaburg Aff. ¶¶ 2-7.) Thus, dealers in New York are not necessarily receiving any less than dealers in any other state. Since dealers in New York and elsewhere are providing the release as part of a broader agreement under which they receive certain payments, the Court is unable to find, absent additional evidence not present in the record, that no consideration is being provided for the releases.

Balancing the findings supported by the record against the need to limit GM's speech as little as possible in the circumstances, *see Gulf Oil,* 452 U.S. at 101-02, the appropriate remedy is to require that notice be given. *See, e.g., Jenifer,* 1999 WL 117762, at *7- *8. GM offers to include the following notice in future agreements:

The release covers any claims arising from Oldsmobile dealership operations, including, without limitation, any claims relating to reimbursement for warranty parts used in Oldsmobile vehicles. Such claims have been asserted in *Ralph Oldsmobile, Inc. v. General Motors Corp.,* No. 99 Civ. 4567(AGS), a lawsuit brought by a former GM dealer as a potential class action in the United States District Court for the Southern District of New York. The Transition Agreement does not include a release of claims arising from Dealership Operations for GM lines other than Oldsmobile.

(Def.'s Mem. at 16.) Plaintiff argues that this is insufficient because it believes the dealers are receiving no consideration. (Reply Mem. at 12-13.) As noted above, the record does not support plaintiff's consideration argument. The Court does agree, however, that GM's proposed notice is inadequate. The notice does not state which dealers may be in the class, if a class is certified. It does not provide information as to the status of the action. It does not indicate how a dealer may obtain more information about the case or contact plaintiff's counsel. It does not clearly state that signing the release may prevent a dealer from recovering damages in this action. And it does not speak at all to the releases that have already been executed. This information should, in the opinion of the Court, be included in such notice.

*6 Plaintiff's proposed relief, forbidding GM from entering into the agreements that include the release, is inappropriate. First, it is not warranted by the po-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tential abuses. Requiring that notice be provided is sufficient to cure any potential unknowing waivers. There is no way to completely eliminate the potential for coercion in the relationship between GM and its dealers. Courts cannot simply interpose themselves in the business relationship between a franchisor and its franchisees each time a franchisee files a putative class action against the franchisor. Notifying the dealers in this action, and their ability to communicate with counsel and participate in the action, should, however, provide a reasonable measure of protection. Second, prohibiting GM from entering into further agreements would infringe upon GM's freedom of speech and upon GM's ability to conduct its business. The cases upon which plaintiff largely relies for its proposed remedy, *Hawkins v. Holiday Inns, Inc.,* No. C-72-217, 1978 U.S. Dist. LEXIS 20083 (W.D.Tenn. Jan. 18, 1978), and *In re Int'l House of Pancakes Litig.,* No. 77, 1972 U.S. Dist. LEXIS 14958, (W.D.Mo. Feb. 24, 1972), are inapposite. Both cases predate *Gulf Oil* and may not comply with its requirements. Furthermore, *Hawkins* relies upon findings that the defendant intentionally coerced potential class members by requiring them to sign releases if they wished to have their franchise agreements renewed, continued, or modified or if they desired extra time to cure any default under the franchise agreements. 1978 U.S. Dist. LEXIS 20083, at *1- *2. Plaintiff provides no comparable evidence here. Instead, GM requires the execution of releases only for potential class members who desire payments above and beyond what they are entitled to under their dealer contracts with GM. In addition, the *Hawkins* court upheld the execution of releases if they were negotiated with proper counsel, meaning either class counsel for class members or other lawyers for potential class members who opted out. Here, since plaintiff has not, to date, moved for class certification, no dealer has been afforded the opportunity to opt out. It would be unfair to require every dealer to use plaintiff's counsel to negotiate a release simply because plaintiff has not yet sought to have the class certified. At most, *Hawkins* would counsel the Court to require that GM only obtain releases from dealers who have consulted with *some* attorney. *International House of Pancakes* barred the defendant from repurchasing franchises, with or without a release, because the issues in the case were simple, trial would end within the calendar year, reviewing the many releases would be burdensome on the court, and the court did not believe that the defendant should be able to negotiate individual settlements

with class members. Here, the issues are complex, this case will not be tried this year (or probably even next), only fifteen releases have been executed to date, no class has been certified, and the Second Circuit has held that defendants may negotiate individual settlements prior to certification of a class. *Christensen v. Kiewit-Murdock Inv. Corp.,* 815 F.2d 206, 213 (2d Cir.1987); *Weight Watchers v. Weight Watchers Int'l, Inc.,* 455 F.2d 770, 773 (2d Cir.1972). For all of these reasons, barring GM from obtaining releases is unwarranted.

**\*7** The Court declines at this time to void the releases that have already been executed. First, GM calls into question the Court's authority to do this (Def.'s Mem. at 15); Ralph Olds does not confront this issue in its reply. Second, even if the Court has the authority to void the releases, no dealer that has signed a release has asked the Court to void its release. Third, there is nothing in the record indicating, one way or the other, what most of the dealers who signed the releases did or did not know about this action. The only dealer as to whom the Court has specific information is former plaintiff John Martin Motors, and it would be difficult to find that a former named plaintiff entered into an unknowing waiver. Fourth, even if a dealer knew nothing about this action when it signed the release, that dealer might wish to ratify the release even after it learns of this action. The appropriate solution is to include in the notice to potential class members a statement to the effect that the Court will consider an application to void a release made by any dealer who signed such a release prior to receiving the notice. That way, dealers will have been advised of their rights; any dealer who wishes to seek to void its release can submit papers; the Court can consider this issue with knowledge of the applicable facts and law; and any dealer who wishes to settle will be able to maintain its release.

III. Conclusion

For the reasons set forth above, the motion is granted in part and denied in part. Specifically, the Court finds that: GM's communications with potential members of the putative class warrant remedial action under Fed.R.Civ.P. 23; the specific relief requested by Ralph Olds is not warranted; to prevent potential abuse, notice must be sent, at GM's expense, to potential members of the putative class, providing them with the information indicated above; and any

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2001 WL 1035132 (S.D.N.Y.)
 **(Cite as: 2001 WL 1035132 (S.D.N.Y.))**

potential member of the putative class who has al-
ready signed a release must be afforded an opportu-
nity to apply to the Court to have that release voided.
The parties shall attempt to agree upon a notice,
which shall be subject to the Court's approval and
which may be provided to dealers. In the event that
the parties are unable to agree within 30 days of this
order, the Court shall issue an order including the
language of the appropriate notice.

SO ORDERED.

S.D.N.Y.,2001.
Ralph Oldsmobile, Inc. v. General Motors Corp.
Not Reported in F.Supp.2d, 2001 WL 1035132
(S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit J



Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2002 WL 272384 (E.D.La.)
 **(Cite as: 2002 WL 272384 (E.D.La.))**

**H**Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
Derrin BASCO, et al.
v.
WAL-MART STORES, INC. et al.
**No. Civ.A. 00-3184.**

Feb. 25, 2002.

ROBY, Magistrate J.

**\*1** On January 3, 2002, the defendant, Wal-Mart
Stores, Inc. ("Wal-Mart"), filed a Motion for Recon-
sideration of Ruling on Plaintiffs' Motion for Protec-
tive Order (doc. # 52). Wal-Mart requests that the
Court reconsider its December 21, 2001 ruling in
which it granted he plaintiffs' Motion for Protective
Order Preventing Defendants from Unsupervised
Contact with Potential Class Members (doc. # 40).
The plaintiffs do not oppose the motion.

I. *Factual Background*

A. Request for Reconsideration

The plaintiffs in this action represent a class of hourly
employees working for Wal-Mart in Louisiana from
September 5, 1990 to the present. They filed this
class action suit seeking redress for themselves and
all other similarly situated who suffered harm as a
result of Wal-Mart's pattern of wide-spread wage
abuses, including failing to record and pay for all of
the time it requires its employees to work or remain
in the store, failing to permit or require employees to
take promised rest or lunch breaks, and forcing them
to work during breaks without compensation.

On December 12, 2001, the plaintiffs filed a Motion
for Protective Order Prohibiting Defendants from
Unsupervised Contact with Potential Class Members.
On December 21, 2001, the undersigned issued an
order pursuant to Local Rule 7.5E [FN1] granting the
plaintiffs' motion as unopposed.[FN2]Also, on Decem-
ber 21, 2001, Wal-Mart filed its opposition to the

plaintiffs' Motion for Protective Order.[FN3]On January
3, 2002, Wal-Mart filed the instant motion requesting
that the Court reconsider its December 21, 2001 rul-
ing. Having been fully briefed on the issues, the
Court will reconsider its ruling.

> FN1. Local Rule 7.5E requires that:

>> "[e]ach party opposing a motion shall file,
>> in duplicate, a memorandum of the rea-
>> sons advanced in opposition to the motion
>> and a list of ... authorities ... [relied upon]
>> ... no later than the eighth calendar day
>> prior to the noticed hearing and shall at
>> the same time serve a copy thereof on the
>> opposing parties."

> FN2. Rec. Doc. # 46.

> FN3. Rec. Doc. # 45.

B. Request for Protective Order

The plaintiffs seek a protective order because they
believe that Wal-Mart may attempt to communicate
with potential members of the class about the subject
matter of this lawsuit, either to solicit affidavit testi-
mony in opposition to class certification or to en-
courage class members to "opt out" of the class after
it is certified. Plaintiffs further contend that any
communication with potential class members initi-
ated by Wal-Mart will misrepresent the status, pur-
pose and effect of the action and will create impres-
sions tending to reflect adversely on the plaintiffs'
cause of action. This type of one-sided communica-
tion, the plaintiffs contend, will interfere with their
rights to bring their claims as a class action under
Rule 23 of the Federal Rules of Civil Procedure.

Wal-Mart opposed the motion contending that the
plaintiffs' motion should be denied due to the plain-
tiffs' failure to provide any evidence of threatened or
actual abuses concerning contacts with putative class
members. Wal-Mart contends that the plaintiffs are
attempting to prevent Wal-Mart from obtaining the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 272384 (E.D.La.)
 (Cite as: 2002 WL 272384 (E.D.La.))

same type of evidence the plaintiffs use in support of their request for certification. Wal-Mart further contends that it has no plans of interviewing any more hourly employees prior to hearing on certification but requests that the Motion for Protective Order be denied on the merits as opposed to being denied as moot.

II *Analysis*

A. Protective Order

**\*2** Rule 26(c) of the Federal Rules of Civil Procedure governs the issuance of protective orders. It provides that:

Upon motion by a party or by the person from whom discovery is sought ... and for good cause shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(1) that the disclosure or discovery not be had;

(2) that the disclosure or discovery may be had only on specified terms and conditions, including a designation of the time or place;

(3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;

(4) that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters;

(5) that discovery be conducted with no one present except persons designated by the court;

If the motion for a protective order is denied in whole or in part, the court, may, on such terms and conditions as are just, order that any party or other person provide or permit discovery.

*See* Fed.R.Civ.P. 26(c).

The decision to enter a protective order is within the court's discretion. *Thomas v. International Bus. Mach.,* 48 F.3d 478, 482 (10th Cir.1995). Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that "the burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."*See In re: Terra International, Inc.,* 134 F.3d 202, 306 (5 th Cir.1998) (citing *United States v. Garrett,* 571 F.2d 1323, 1326 n. 3 (5 th Cir.1978)).

B. Class Actions

Rule 23 of the Federal Rules of Civil Procedure governs class actions in federal court. Class actions serve an important function in our system of civil justice. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99 (1981). They present, however, opportunities for abuse as well as problems for courts and counsel in the management of cases. *Id.* at 99-100. Communications that misrepresent the status or effect of the pending action also have been found to have a potential for confusion and/or to adversely affect the administration of justice. *Id.* at 101 n. 12. Courts have condemned attempts in a communication to affect a class member's decision to participate in the litigation, or to undermine a class plaintiff's cooperation with confidence in class counsel. *In re School Asbestos Litigation,* 842 F.2d 671, 682 n. 23 (3rd Cir.1988). Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. *Gulf Oil,* 452 U.S. at 99. However, this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules. *Id.*

**\*3** Communications found violative of the principles of Rule 23 include misleading communications to the class members concerning the litigation. *Hampton Hardware, Inc. v. Cotter & Co., Inc.,* 156 F.R.D. 630, 632 (N.D.Tex.1994). Unlimited contacts by defendants with class members or potential class members may serve to undermine the purposes of Rule 23, by allowing defendants to reduce their liability by encouraging potential class members not to join the

litigation. Thus, where an alleged class action has been filed but certification has not yet been decided, a court may issue a limitation on ex parte contact under Rule 23, if it is clear the defendant is attempting to engage in conduct which would undermine the purposes of the rule. *Burrell v Crown Central Petroleum, Inc.,* 176 F.R.D. 239, 243 (E.D.Tex.1997).

An order limiting communications between parties and class members however, is a prior restraint on speech. *Id.* A district court should only consider the narrowest possible relief "that limits speech as little as possible consistent with the rights of the parties under the circumstances." *Gulf Oil,* 452 U.S. at 102. The movant does not have to show specific detriments to plaintiffs or the plaintiff class. *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1206 (1985). A showing of actual harm is not necessary. *Hampton Hardware,* 156 F.R.D. at 633. "It is unnecessary for a trial court to issue particularized findings of abusive conduct when a given form of speech is inherently conducive to overreaching and duress." *Kleiner,* 751 F.2d at 1206.

Nonetheless, an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. *See Gulf Oil,* 452 U.S. at 101. Such a weighing should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances. Courts should not limit communications without a specific record showing by the moving party of the particular abuses by which it is threatened. *Id.* at 102.Absent a clear record and specific findings of realized or threatened abuses, an order cannot be justified under the relevant standard. *Burrell,* 176 F.R.D. at 244.

In the instant case, while it is evident that there is an ongoing business relationship between employee and employer, it is not enough that a potentially coercive situation exists. *Burrell,* 176 F.R.D. at 244. The Court must have "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."*Id.* (citing *Gulf Oil,* 452 U.S. at 101). While actual harm does not have to be shown, there must be

some evidence that justifies an interference with defendant's speech. The Court cannot issue an order without evidence that a potential for serious abuse exists. *Id.*

**\*4** The cases cited by the plaintiffs illustrate the evidentiary requirement necessary for an order restricting communication. For example, in *Kleiner* and *Hampton Hardware,* the actual abuse or potential for abuse was clearer. In *Kleiner,* the defendant entered into a telephone campaign in which it contacted its customers in an effort to reduce the size of the potential class by encouraging possible claimants to opt out of the litigation. Evidence showed that counsel for the defendant instructed the defendant's sales force to "do the best selling job they had ever done" in order to get customers to opt out of the class action. *Kleiner,* 751 F.2d at 1198.

Similarly, in *Hampton Hardware,* a member of a cooperative association of hardware stores filed a class action against the association. In response, the association sent letters to the individual members, urging them not to join the lawsuit. All three letters were before the court in its consideration of the ex parte motion. The first letter stated that joining the lawsuit would be at an "enormous potential cost to your Company" and that "all of this will cost you precious dollars and us precious time from our mission."*Hampton Hardware,* 156 F.R.D. 631. The second letter stated: "By not participating in this suit, you will help save your Company expense in dollars and time."*Id.* at 632.The third letter stated, in part: "By asking you to join the class, plaintiff is asking you to sue yourself."*Id.*

In contrast, the plaintiffs here have not provided the Court with evidence to show that Wal-Mart has abused the process or attempted to undermine the purposes of Rule 23. They only state that they believe Wal-Mart may attempt to communicate with potential members of the class about the lawsuit. The plaintiffs also state that Wal-Mart has taken or may take affidavits of potential class members. However, the plaintiffs, a class of hourly employees, have only provided the Court with non-probative evidence of Wal-Mart's communications with a managerial employee. Thus, the plaintiffs have failed to make the necessary showing that the affidavits taken by Wal-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 272384 (E.D.La.)
**(Cite as: 2002 WL 272384 (E.D.La.))**

Mart is an abusive action against potential class members that requires protection from the Court.

Further, assuming arguendo that the affidavits were taken of hourly employees, there is no evidence that the method used to obtain the affidavit was an abusive practice requiring the protection of the Court. The affidavits do not indicate that Wal-Mart was explicitly or implicitly attempting to discourage or prevent the employees from participating in the lawsuit, nor do they indicate that any threats were made. Therefore, the plaintiffs have provided no evidence, other than speculation, that Wal-Mart is attempting to coerce it employees to not participate in or "opt out" of the suit. Accordingly,

IT IS ORDERED that the Motion for Reconsideration of Ruling on Plaintiffs' Motion for Protective Order (doc. # 52) is GRANTED.

**\*5** IT IS FURTHER ORDERED that the Motion for Protective Order Preventing Defendants from Unsupervised Contact with Potential Class Members (doc. # 40) is DENIED.

E.D.La.,2002.
Basco v. Wal-Mart Stores, Inc.
Not Reported in F.Supp.2d, 2002 WL 272384 (E.D.La.)

END OF DOCUMENT

# Exhibit K



☞Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Sylvester JENIFER, T/A Vernon's Home Improve-
ments on behalf of itself and all others similarly situ-
ated, National Solid Waste Management Association;
All-Rite Rubbish Removal, Inc.; All-Rite Rubbish
Removal, Inc., d/b/a Metcalf; J & M of De., Inc.,
Arrow Disposal of Smyrna, Inc., Walter S. Bandur-
ski, Inc.; and Modern Disposal, Inc. on behalf of
themselves and all others similarly situated, Plain-
tiffs,
v.
DELAWARE SOLID WASTE AUTHORITY, De-
fendant.
No. CIV.A. 98-270 MMS, CIV.A. 98-565 MMS.

Feb. 25, 1999.

David Staats, Esq., of Law Offices of David Staats,
P.A., Wilmington, Delaware; Of Counsel: Jeffrey A.
Klafter, Esq., and John P. Coffey, Esq., of Bernstein
Litowitz Berger & Grossman LLP, New York, New
York; counsel for plaintiffs.

F. Michael Parkowski, Esq., of Parkowski, Noble &
Guerke, P.A., Dover, Delaware; counsel for defen-
dant; John C. Phillips, Jr., Esq., of Phillips, Goldman
& Spence, P.A., Wilmington, Delaware; special
counsel for defendant.

David S. Eagle, Esq., of Klehr, Harrison, Harvey,
Branzburg & Ellers, LLP, Wilmington, Delaware; Of
Counsel: David Zalesne, Esq., Jennifer A. Irrgang,
Esq., of Klehr, Harrison, Harvey, Branzburg &
Ellers, LLP, Philadelphia, Pennsylvania; counsel for
BFI Waste Systems of North America, Inc.

James McC. Geddes, Esq., of Ashby & Geddes,
Wilmington, Delaware; counsel for Waste Manage-
ment of Delaware, Inc.

MEMORANDUM OPINION

SCHWARTZ, Senior District J.

I. INTRODUCTION

*1 Two actions challenging the flow control regula-
tions of defendant Delaware Solid Waste Authority
("DSWA") have been filed. The plaintiffs in each
matter seek declaratory and injunctive relief and
damages for violations of Article I, § 8, clause 3 of
the United States Constitution (the "Commerce
Clause") and Title 42, § 1983 of the United States
Code.The Court has jurisdiction over both actions
pursuant to 28 U.S.C. § 1331. The first action was
filed on May 21, 1998, by Sylvester Jenifer. D.I. 1,
Civil Action No. 98-270 MMS.FN1 The second action
was filed on October 2, 1998, by the National Solid
Wastes Management Association ("NSWMA"), two
solid waste haulers, and several former solid waste
haulers. Civil Action No. 98-565 MMS. All plaintiffs
are represented by the same counsel and both law-
suits were filed as a putative class action. The Court
ordered the two cases consolidated on January 22,
1999. The putative class has not been certified.FN2

> FN1. The Docket Item ("D.I.") number re-
> fers to either Civil Action No. 98-270-MMS
> or Civil Action Nos. 98-270/98-565-MMS
> (Consolidated), except where otherwise
> noted.

> FN2. Plaintiffs filed for class certification on
> January 29, 1999.

The present motion concerns informational meetings
and other communications between DSWA and
waste haulers. Plaintiffs allege that DSWA improp-
erly contacted potential class members, and ask the
Court to order that DSWA be enjoined from such ex
parte contact.

II. FACTS

The lawsuit challenges the constitutionality of
DSWA's "flow control" regulations.FN3Plaintiffs al-
lege that they have been forced to dispose of solid
waste at DSWA facilities, where "tipping fees" are

significantly higher. Plaintiffs allege that the DSWA flow control regulation is in violation of the "dormant commerce clause" as impermissible state interference in interstate commerce. The putative class members include all persons in the state of Delaware who delivered and transported solid waste generated within the state for disposal at DSWA facilities, and who paid fees to DSWA from May 21, 1995 until the time that the flow control regulation is abrogated. D.I. 1, ¶ 11 (Jenifer complaint); D.I. 1, ¶ 35 (NSWMA complaint, Civil Action No. 98-565).

> FN3. These regulations require that most solid waste generated within the state of Delaware must be disposed of in Delaware at a facility controlled by the defendant. *See* D.I. 37, App. 51 (Regulation 4.01).

Plaintiffs allege that in response to the lawsuit, DSWA has surreptitiously contacted members of the potential class and offered them a coercive "financial deal" in exchange for a release of liability for DSWA "flow control" regulations. Essentially, the "financial deal," known as a differential pricing plan, would eliminate flow control regulations, and thus, allow haulers to dispose of Delaware generated waste at out-of-state facilities. Disposal of solid waste within Delaware would remain at the current rate of $58.50 per ton.[FN4] However, waste haulers who sign a three-year contract to dispose of their Delaware generated waste at a DSWA facility and who also agree to release DSWA from any liability concerning "flow control" regulations would receive an annual rebate of $10 per ton.[FN5]

> FN4. The testimony at the January 13, 1999 hearing indicated that $58.50 per ton is a high rate as compared to other markets. D.I. 50, Tr. 82 (Harvey).

> FN5. Haulers may be eligible for a further rebate. If the DSWA receives more than 800,000 tons per year from all sources, DSWA will pay $8.50 into a pool for each excess ton and the haulers would receive a pro rata share of the pool based upon tonnage delivered.

A. The Meetings Between DSWA And Waste Haul-

ers

After the filing of the Jenifer action in May 1998, DSWA met a couple of times with its two largest customers, BFI Waste Systems of North America, Inc. ("BFI") and Waste Management of Delaware, Inc. ("Waste Management"), for preliminary discussions regarding modification of the flow control regulation and a possible rebate program. On November 18, 1998, DSWA again met with BFI and Waste Management. DSWA indicated that it was contemplating an amendment to the regulation so that its customers could dispose of solid waste generated within Delaware at any location, including out-of-state facilities. At this meeting, a differential pricing plan was discussed. DSWA made it known that the provision releasing DSWA from liability for its flow control regulation was a condition of participating in the differential pricing plan. D.I. 37, App. A-8, A-14. Plaintiffs' counsel had no notice of the meeting, and thus, were not present. On November 24, 1998, DSWA met with another group of smaller haulers and discussed the differential pricing plan. DSWA also stated it was considering the option of entering the business of solid waste disposal and directly competing against its customers. D.I. 37, App. A-16. Again, DSWA stated that the release from liability provision was a necessary provision in the contract. DSWA informed the smaller haulers that BFI and Waste Management, their largest competitors, reacted favorably to the differential pricing plan and were inclined to participate. D.I. 50, Tr. 68 (Vasuki).[FN6] Plaintiffs' counsel had no notice of and did not attend the November 24 meeting.

> FN6. "Tr. ___" refers to the page(s) of the transcript of the January 13, 1999 hearing. D.I. 50.

B. Interim Order

**\*2** According to the plaintiffs, the communications between DSWA and putative class members improperly attempt to coerce putative class members not to participate in the litigation. Plaintiffs request that the Court enjoin DSWA from communicating with potential class members concerning the instant litigation. Plaintiffs base their motion seeking injunctive relief on Rule 23(d) of the Federal Rules of Civil

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Procedure. Further, plaintiffs ask that the Court order DSWA to send corrective notices, at defendant's expense, to all class members. The requested notices are to describe, *inter alia,* the claims asserted, relief sought by plaintiffs, and any prohibitions this Court may impose on DSWA's communications with class members. D.I. 36 at 7 (Plaintiffs' Pre-Hearing Brief). DSWA maintains that its communications with waste haulers were merely informational and that it did not intend to coerce or mislead the waste haulers.

Plaintiffs brought the defendant's communications to the Court's attention during telephonic hearings on December 2 and December 11, 1998. The Court without benefit of briefing entered an Interim Order on December 17, 1998. On January 7, 1999, BFI and Waste Management filed for relief from the Interim Order and plaintiffs' motion seeking injunctive relief limiting defendant's communications with class members. The Court held a hearing on January 13, 1999 to further consider the matter.[FN7]

> **FN7.** At the evidentiary hearing, plaintiffs called N.C. Vasuki, CEO of DSWA, and William Davidson, President of the Maryland-Delaware Solid Waste Association and an officer of a potential class member. DSWA called F. Michael Parkowski, counsel to DSWA. BFI cross examined Davidson. Waste Management called E. Thomas Harvey, Regional Vice President of Waste Management. D.I. 50.

III. DISCUSSION

A. Legal Standard

The class has not been certified.[FN8]Rule 23(d) of the Federal Rules of Civil Procedure gives the court authority to limit communications with *class members* concerning the litigation. Therefore the first issue is whether the Court has the power to limit contacts with members of an uncertified class. I conclude the Court does have the requisite authority to limit contacts with putative class members. The purpose of Rule 23 is to protect the interests of absent class members and foster the fair and efficient resolution of class action issues. *In re School Asbestos Litigation,* 842 F.2d 671, 680 (3d Cir.1988). District courts

may issue Rule 23 orders to prevent abuses of the class action process. *Id.* at 680.The effect of a defendant attempting to influence potential plaintiffs not to join a potential class action is just as damaging to the purposes of Rule 23 as a defendant that influences members of an already certified class to opt out. *See Burrell v. Crown Central Petroleum, Inc.,* 176 F.R.D. 239, 243 (E.D.Tex.1997) (citing *Hampton Hardware, Inc. v. Cotter & Co., Inc.,* 156 F.R.D. 630, 632 (N.D.Tex.1994)). In both scenarios, improper communications could diminish the size of the class or potential class, and thus, reduce the potential liability. *Burrell,* 176 F.R.D. at 243.

> **FN8.** On December 30, 1998, plaintiffs filed a motion for injunctive relief limiting defendant's communications with class members. (D.I.35).

It is therefore not surprising that a party in a class action may not send misleading communications because they pose a serious threat to the fairness of the litigation process. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 n. 12 (1981); *Hampton Hardware,* 156 F .R.D. at 632; *In re Winchell's Donut Houses, 1988 WL 135503, at *1 (Del. Ch. Dec. 12, 1988)* ("Surely, a defendant may not, in its communications with class members prior to certification, deceive or mislead class members."). This court has condemned a defendant's communications attempting to affect a class member's decision to participate in the litigation. *In re School Asbestos Litigation,* 842 F.2d at 682 n. 2;*see also* Manual for Complex Litigation (3rd edition 1995), ¶ 30.24 (stating that defendants may not give false or misleading information or attempt to influence class members in making their decision whether to remain in the class).

*3 Nonetheless, before a class action is certified, it will ordinarily not be deemed inappropriate for a defendant to seek to settle individual claims. *In re Winchell's Donut Houses, 1988 WL 135503, at *1* (citing *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc.,* 455 F.2d 770, 773 (2d Cir.1972)); *see Cada v. Costa Line, Inc.,* 93 F.R.D. 95, 98 (N.D.Ill.1981) ("Individual class members who choose to settle (or to litigate or indeed just to forget about) their claims are simply opting out of the class, an opportunity available to them until there has

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

been a class determination under Rule 23(c)."); Manual for Complex Litigation (3rd edition), ¶ 30.24 (1995) (defendants ordinarily not precluded from communications with putative class members, including discussions of settlement offers with individual class members before class certification).

**B. Does The Conduct By DSWA Merit A Limitation Order?**

The Court starts with the precept that it only should consider the narrowest possible relief "that limits speech as little as possible consistent with the rights of the parties under the circumstances." *Gulf Oil,* 452 U.S. at 102. The Court must be cognizant of issuing orders limiting communications within the bounds of First Amendment principles. *Id.* at 100.Plaintiffs do not have to show actual harm, but only that a restricting order would guard against the "likelihood of serious abuses." *Id.* at 104.A demonstration that the "interests embodied in Rule 23 might be hindered is a sufficient finding upon which to base an order limiting contacts." *Hampton Hardware, Inc. v. Cotter & Co., Inc.,* 156 F.R.D. at 633. The Supreme Court in *Gulf Oil,* however, articulated the need for "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." 452 U.S. at 101.

Plaintiffs argue that DSWA's proposal is likely to influence potential class members to give up their claims in this litigation. Plaintiffs assert that the communications were improper because the defendant's intent was to induce the major haulers into accepting the contract. They point out that if the major haulers received a $10 per ton cost advantage, then the smaller haulers would be forced to sign the contract because they could not effectively compete. Plaintiffs concede that a defendant in a prospective class action may engage in settlement discussions with prospective class members before class certification, but argue that the communications at issue attempt to influence potential class members not to participate in the class action. Further, plaintiffs urge that the communications are misleading because (1) DSWA misled smaller haulers invited to the November 24, 1998 meeting by characterizing its rebate for release proposal as a mere regulatory change, when the proposal was actually a settlement offer, and (2)

the potential class members were never told about the benefits of the litigation.

**\*4** The plaintiffs rely on *Hampton Hardware* and the recently decided case of *Carnegie v. H & R Block, Inc.,* (N.Y.Sup. Feb. 2, 1999). In *Hampton Hardware,* a member of a cooperative association of hardware stores filed suit against the association. The defendant sent three letters to individual members, asking them not to join the lawsuit. The first letter stated that the lawsuit would "cost you precious dollars and us time from our mission." 156 F.R.D. at 631. The second letter stated that "[b]y not participating in this suit, you will help save your Company expense in dollars and time." *Id.* at 632.The third letter stated that "[b]y asking you to join the class, [plaintiff] is asking you to sue yourself."*Id.* The court held that the letters were improper because they were an attempt "to reduce the class members [sic] participation in the lawsuit based on threats to their pocketbooks."*Id.* at 633.The court noted that the ongoing commercial relationship between the defendant and putative class members made the communications inherently coercive. *Id.*

In *Carnegie v. H & R Block,* the defendant added a provision in its tax services contract that required the arbitration of claims after the initiation of a class action and before class certification. The plaintiff argued that the purpose of the arbitration clause was to destroy class members' entitlement to participate in the class action and to bypass court supervision of class action certification and notice procedure. *Id.* at F-2. The court agreed and held that the arbitration clause would not preclude class member participation in the litigation unless the members opted out after proper notice of the pendency of class action. *Id.* at F-6.

The Court recognizes that an ongoing business relationship, such as the relationship here between DSWA and the waste haulers, can increase the possibility that the communications between litigants are coercive. *See, e.g., Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193, 1201 (11th Cir.1985) (potential class members were bank customers of the defendant); *Hampton Hardware,* 156 F.R.D. at 633 (potential class members were hardware stores whereas defendant was the hardware supplier); *but see In Re*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:07-cv-00418-ADS-ETB   Document 219   Filed 07/31/09   Page 56 of 63 PageID #: 1598

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 1999 WL 117762 (D.Del.)
**(Cite as: 1999 WL 117762 (D.Del.))**

*Winchell's Donut Houses,* 1988 WL 135503, at *1 ("Particularly where the class is comprised of persons with whom the defendant has an ongoing commercial relationship, it would seem distinctly ill-advised to attempt to require the defendant to deal with what may be an important aspect of a commercial relationship only through the channel of a self-appointed class action plaintiff."). Where there is a relationship that is inherently coercive, the court does not need to make a finding that a particular abuse has occurred. *See Burrell v. Crown Central Petroleum, Inc.,* 176 F.R.D. at 244 (citing *Kleiner* and *Hampton Hardware* ). The court, however, must still require a clear record of threatened abuses. *Gulf Oil,* 452 U.S. at 101; *Hampton Hardware,* 156 F.R.D. at 632. There must be some evidence that justifies an interference with DSWA's speech. *Burrell,* 176 F.R.D. at 244. The Court is not persuaded that DSWA, one way or the other, would have formulated the differential pricing program in the absence of the filing of these lawsuits. The Court is persuaded that it was the practice of DSWA to usually give waste haulers 18 months notice before any proposed changes in tipping fees. The time line is much shorter for the differential pricing program, thus leading to an inference that DSWA is in a hurry for reasons not yet articulated. D.I. 50, Tr. 24 (Vasuki). On the other hand, plaintiffs have not provided the Court with a clear record to show that the communications were misleading or coercive, or an improper attempt to undermine Rule 23 by encouraging putative class members not to join the suit.

**\*5** The Court finds that the evidence does not establish that putative class members would be threatened or coerced into foregoing any claims in the present lawsuit. The test for coercion is whether the conduct somehow overpowers the free will or business judgment of the potential class members. *See Mobilificio San Giacomo S.p.A. v. Stoffi,* 1998 WL 125536, at *9 (D. Del. Jan 29, 1998). Unlike the coercive letters in *Hampton Hardware,* plaintiffs were not (1) warned of the potential cost of the lawsuit to them, (2) "specifically advised not to participate in the lawsuit," and (3) "told that by participating in the lawsuit they are suing themselves." 156 F.R.D. at 632-33. The letters in *Hampton Hardware* served no purpose other than to warn potential class members that they would pay if they participated in the lawsuit. *Id.* at 633.The communications here relate to a business proposition which potential class members are free to reject if they decide the costs outweigh the benefits. Further, the differential pricing program is open to all haulers on the same terms.

Those waste haulers who do not participate would be free to take their solid waste out of state at possible lower disposal costs. Further, they would be able to pursue their claims in this litigation and have the opportunity to receive damages. While this business decision could be difficult, the waste haulers are free to weigh the risks and benefits of participating in the class action. If a hauler wishes to become a class member in the instant litigation, yet continue to dispose of solid waste in Delaware, it would have to pay $58.50 per ton, but would not receive the $10 per ton rebate under DSWA's differential pricing program. However, without flow control regulation, all haulers, including smaller ones, would be able to dispose of their waste outside of Delaware.

The testimony at the January 13, 1999 hearing did not show that putative class members will have no choice but to give up their claims in the lawsuit because the alternative would invite economic ruin. At the January 13, 1999 hearing, plaintiffs called William Davidson, President of the Maryland/Delaware Solid Waste Association, officer of Able Recycling, and former President of All-Rite Rubbish Removal d/b/a Metcalf (one of the named plaintiffs). He testified that a small hauler, such as Able Recycling, would have to sign DSWA's contract with the release provision "in order to stay competitive with our competitors."D.I. 50, Tr. 141. Davidson also believes that even without flow control regulations smaller haulers would not necessarily gain an advantage. Smaller haulers would face additional costs in disposing of their waste out of state. The additional costs would be due to driving distance, the possible need to hire additional employees and buy additional trucks, and the disruption of routes. D.I. 50, Tr. 142-44. While nearby, out-of-state disposal facilities exist, such as BFI's American Ref-Fuel facility in Chester, Pennsylvania, Davidson testified that they are owned by either BFI or Waste Management. D.I. 50, Tr. 143. According to Davidson, a smaller hauler cannot rely on obtaining a competitive rate from their competitors. *Id.* ("I don't think [BFI] would give you a favorable rate at their facility while you were competing

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*6 Davidson's testimony clearly does not establish the possibility of coercion. First, Davidson conceded that he did not base his views that smaller haulers would be forced to join the differential pricing program on a specific disposal fee. D.I. 50, Tr. 164 (stating that "I have not sat down and figured that out" in reference to a specific disposal fee). There must exist some disposal fee where smaller haulers would find it economically efficient to dispose of their waste at out-of-state facilities. By not referencing a specific price, Davidson seems to ignore this proposition.[FN9] For example, Thomas Harvey, Regional Vice President of Waste Management, stated that "[c]urrently the small hauler can beat this 48.50 a ton rate. All costs in [ ] transportation, handling, permitting, licensing, etc., [haulers] can easily beat the $48.50 a ton rate."D.I. 59, App. D-23 (Harvey Dep. at 32). Further, Harvey testified that "[p]robably cost-cost basis, somewhere around 40 to 42 dollars a ton is available to even a small hauler in surrounding jurisdictions."D.I. 50, Tr. 86. Davidson's testimony did not directly address these assertions. Second, Davidson's deposition indicated that he misunderstood the provision dealing with the additional, pro-rata $8.50 per ton rebate, as described *supra.*D.I. 67, App. E-13-E-16 [FN10] (Davidson Dep.). Third, DSWA asserts that Davidson speculated that American Ref-Fuel would not give competitors of BFI, a part owner of the facility, fair treatment, even though Davidson had never used the Ref-Fuel facility. D.I. 50, Tr. 143, 166-67. On the other hand, Harvey essentially testified that the differential pricing plan had several advantages for smaller haulers, including the removal of the possibility that large, vertically integrated companies would drop disposal rates, a guaranteed price, and lower disposal rates out of state. D.I. 59, App. D-20-D-24 (Harvey Dep. at 29-33). The Court holds a clear record of threatened abuses does not exist. *Burrell, 176 F.R.D. at 244.*

> FN9. However, Davidson did state under cross examination that even if an out-of-state disposal fee is as low as $30 per ton, a smaller hauler could not compete against a $48.50 per ton rate in state. D.I. 50, Tr. 165.

> FN10. Davidson stated: "If they reach

780,000 tons, is my understanding, from what I remember, they would get a rebate of $10 a ton. And if it exceeded that, then they could get up to 8.50, I believe. That was depending on how many tons they got in over the 780. So that would bring the price down to $40 per ton."App. E-13.

C. BFI and Waste Management

As stated above, both BFI and Waste Management filed objections to the Court's Interim Order and any future Court order limiting communications. The record indicates that BFI and Waste Management are neither coerced nor misled by any communications by DSWA. BFI and Waste Management stated that they have significant knowledge of flow control regulations and considerable experience in litigation involving the validity of such regulations. Both understand the benefits of such litigation. Both waste haulers are willing to trade the certainty of a favorable settlement with DSWA for the uncertainty of protracted litigation. For example, Waste Management stated that its experience in flow control matters, and the experience of its counsel, will produce a settlement equal to or better than that which may be reached by plaintiffs. BFI and Waste Management apparently viewed the meetings with DSWA as an effort to negotiate a settlement. D.I. 44, Harvey Aff. ¶ 5; D.I. 43, BFI Obj. ¶ 9. Finally, both BFI and Waste Management stated that they would opt out of the class and pursue their own settlement. In short, BFI and Waste Management do not appear to need the protection of the Court.

*7 There remains the contention that DSWA misled the waste haulers. *See Hampton Hardware, 156 F.R.D. at 632* ("Communications found violative of the principles of Rule 23 include misleading communications to the class members concerning the litigation."). DSWA clearly views the release provision as an important term of the proposed differential pricing program. DSWA's expectation of a release of claims was made known at the various meetings between DSWA and the waste haulers. *See* D.I. 50, Tr. 71-72 (Vasuki); D.I. 40, Defendant's Pre-Hearing Brief at 9-10 (September 1998 meeting), 10 (October 9, 1998 meeting), 10-11 (November 18, 1998 meeting), 11-12 (November 24, 1998 meeting).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

During the week of December 14, 1998, DSWA communicated with certain members of the potential class by sending them copies of the proposed amendments to the regulations and by sending them copies of the "Differential Disposal Fee Program." D.I. 37, App. A-21 (Vasuki Tr. at 132). Plaintiffs complain that the mailing omitted the release provision of the DSWA contract. Plaintiffs assert that this communication was misleading because haulers would not know of the release provision and would be unfairly surprised at a later time. That is true, but plaintiffs are hoisted by their own petard. Plaintiffs fought for and obtained the Interim Order which foreclosed "DSWA, its officers, employees, attorneys and representatives ... from any communications with members of the Class concerning their participation in the litigation or relinquishing any rights they may or benefits they might receive under the Actions."The Court finds that DSWA reasonably omitted the release provision from the mailing in an attempt to comply with the Court's Interim Order, which was in effect at the time of the mailing.

Plaintiffs complain of DSWA's conduct at the November 24 meeting because haulers were not told that they were invited to a meeting to settle their claims. The Court notes that DSWA previously argued that its communications were merely informational and that no offers regarding settlement of the class action or class claims were made. Defendant's Pre-Hearing Brief at 15. Now, however, in its Post-Hearing Brief, DSWA argues that "DSWA has the right to settle claims."Defendant's Post-Hearing Brief at 21.

While the defendant may seek to settle individual claims prior to certification, the putative class members should know the essence of the claim they would be giving up in response to the solicitation of DSWA. Those who sign the DSWA three-year contract may be completely unaware of this litigation and by signing the contract would waive their right to participate in the class action. Some potential plaintiffs may wish to participate in the action and, therefore, should be given the necessary information and opportunity to choose between signing the contract and participating in the differential pricing program or not participating, but have the right to ship waste out of state. Before any waste hauler signs the release contained

in the differential pricing plan, DSWA must give waste haulers adequate notice of the pendency of this action and that by signing the release they forego their right to participate in this litigation. So that waste haulers will have sufficient notice of the pendency of this action, DSWA must prominently notify every waste hauler at the time it sends the differential pricing plan to the waste haulers and at any public meeting where the differential pricing program is discussed. A similar notification should be provided to waste haulers who have already received DSWA's proposed differential pricing plan. This is a reasonable form of notice and correction that does not impinge on DSWA's right to engage in commercial speech.

IV. CONCLUSION

**\*8** Based on the reasons set forth above, the Court holds that the plaintiffs have not submitted sufficient evidence to demonstrate that the potential for coercion or confusion is so great as to warrant an interference with DSWA's right to engage in commercial speech with the waste haulers. However, the Court will require DSWA to notify putative class members of the pendency of this action before any putative class member agrees to the release included in the differential pricing contract.

A proposed form of order, including the form of notification, shall be filed with the Court by 12 noon on March 4, 1999. If the parties cannot agree on the proposed form of order, competing forms of order shall be filed by the same date and time.

D.Del.,1999.
Jenifer v. Delaware Solid Waste Authority
Not Reported in F.Supp.2d, 1999 WL 117762 (D.Del.)

END OF DOCUMENT

Exhibit L



Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 5314916 (W.D.Wis.)
 **(Cite as: 2007 WL 5314916 (W.D.Wis.))**

▷Only the Westlaw citation is currently available.

United States District Court,
W.D. Wisconsin.
Maurice James SJOBLOM, on behalf of himself and
a class of employees and/or former employees simi-
larly situated, Plaintiff,
v.
CHARTER COMMUNICATIONS, LLC, Charter
Communications (CCI), Inc. and Charter Communi-
cations, Inc., Defendants.
**No. 3:07-cv-0451-bbc.**

Dec. 26, 2007.

Michael J. Modl, Timothy D. Edwards, Axley Bry-
nelson, LLP, Robert Gingras, Gingras, Cates & Lue-
bke, S.C., Madison, WI, for Plaintiff.

Andrew J. Voss, Jacqueline Kalk, Littler Mendelson,
Minneapolis, MN, Bradley Strawn, Lisa Schreter,
Littler Mendelson, Atlanta, GA, Harry W. Wellford,
Jr., Kimberly A. Yates, Littler Mendelson, P.C., St.
Louis, MO, for Defendants.

OPINION AND ORDER

BARBARA B. CRABB, District Judge.

**\*1** This is a civil action for monetary, declaratory and
injunctive relief under the Fair Labor Standards Act,
29 U.S.C. §§ 201-219, and Wisconsin wage and hour
laws, Wis. Stat. chs. 103 and 104 and §§ 109 .01-
109.11. On October 5, 2007, plaintiff moved for con-
ditional certification of a collective action under the
Fair Labor Standards Act. 29 U.S.C. § 216(b). In
response, defendants filed several affidavits from
their current employees in support of their argument
that plaintiff is not similarly situated to potential class
members. Sixty-two affidavits were signed by poten-
tial class members. Dkt. # s 47-108. Before the court
is plaintiff's motion for a protective order restricting
communications between defendants and potential
class members. Plaintiff contends that defendants
improperly interviewed their employees about the
lawsuit under the pretext of a training session and
failed to inform the employees of their potential in-

terest in the current lawsuit as opt-in plaintiffs. Plain-
tiff also asserts that the court should strike the affida-
vits at issue, order defendants to send corrective no-
tice to potential class members nationwide and award
him reasonable costs and fees for bringing the mo-
tion.

Because I agree that defendants acted improperly in
questioning their employees and by failing to inform
them of their potential interests in this lawsuit, I am
granting plaintiff's motion in part. I am striking the
62 affidavits of potential class members submitted by
defendants. Defendants may not contact potential
class members without seeking prior consent of this
court and without fully disclosing the nature of the
lawsuit and the class member's potential interest in it.
I also agree that if a collective action is conditionally
certified, it will be necessary to send some form of a
corrective notice to the 62 potential class members
who made declarations. The court will address the
specific content of the notice if and when the class is
certified. Finally, I am denying plaintiff's requests for
fees and costs because there is no basis for such an
award under Fed.R.Civ.P. 37.

Before I address the parties' arguments, I will sum-
marize the relevant allegations contained in the affi-
davits submitted in support of the motion for a pro-
tective order and the documents attached to the par-
ties' briefs.

ALLEGATIONS OF FACT

David Zrout and Matthew Tuescher are broadband
technicians for defendant Charter Communications,
LLC in Janesville, Wisconsin. Zrout averred that on
October 16, 2007, his employer told him to go to
Lake Lawn Lodge in Delavan, Wisconsin for train-
ing. Tuescher was told the same in mid-October
2007. Other technicians from Janesville, Walworth
and Beloit were present at the training. After 15 min-
utes of training, Zrout and Tuescher were asked to
meet individually with Charter attorneys. Both men
were told that an employee had filed a lawsuit against
Charter and were asked to answer some questions.
Zrout was questioned for an hour and a half to two
hours, and Tuescher was questioned for one hour.
Both men were asked the same questions repeatedly.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*2** Zrout and Tuescher averred that the attorney interviewing them did not have them sign a consent form or tell them that the lawsuit involved a potential class action; they possibly could be a class member based on the issues for which they were being interviewed; they may have the right to collect money in the future if the lawsuit was successful; or signing the statement could waive their right to participate in the lawsuit or receive money from defendants. Plaintiff later learned, *see* dkt. # 148, that both men actually did sign a witness disclosure form, which informed them of the following:

1. Our law firm represents Charter in a lawsuit, which is styled as a class and collective action, brought against it by a technician working out of one of Charter's locations.... If you choose to speak with us today the information you provide may be used by the Company to show that you are not similarly situated to the employee who has filed this action. In the lawsuit, the employee claims that he and other similarly situated employees have not been properly paid for all his working time, including overtime.

...

3. You have no obligation to talk to me. Your job will not be affected in any way whether you talk to me or not. Regardless of your decision, you will not be penalized in any way, nor will you receive any benefit from Charter based on any information you do or do not provide me. If I ask you a question that you do not wish to answer, just say so. You are free to end our discussion at any time.

4. Please let me know if you are represented by an attorney in any way related to your employment. If you are, we should not speak further.

5. The information that you provide will be compiled with information from other interviews, and will be used by our firm to provide legal advice to the Company and to assist in its defense of the lawsuit. We believe that this makes our discussion confidential and privileged, and it is important that you do not repeat our discussion. However, if you are asked by an attorney representing the employee bringing the lawsuit to provide information about your job, you are free to do so or decline to do so.

You are, of course, also free to retain your own attorney to advise you on these issues....

Dkt. # 150, Attachments 1 and 2. Each of the other employees who made a declaration after being interviewed by defendants at the October 2007 training session signed a similar consent form.

During his interview, Tuescher told Charter's attorney that he spent about 15 minutes every night at home organizing and securing his equipment but that he did not take the equipment into his house. Tuescher also told the Charter attorney that he usually came in about 30 minutes early every day to do paperwork, organize his truck, clean out and restock equipment and reconcile equipment before starting work on the clock. No one had ever required Tuescher to do this, but a few months ago, Charter told its employees not to do any work whatsoever before they were on the clock in the morning. Neither Tuescher nor Zrout used the word "nominal" during his interview and the term was not explained to them. Zrout told the Charter attorney that he was not represented by an attorney.

**\*3** After interviewing them, the Charter attorneys gave Zrout and Tuescher statements to sign. Both men looked quickly at the declaration prepared for them, assuming that it was accurate. Zrout and Tuescher averred that they would not have signed the declaration had they been told that there was a potential class action from which they could collect money or that signing the declaration might constitute a waiver of their right to participate in the class action.

Defendants' attorney Jacqueline Kalk and other members of her law firm wrote a treatise entitled *Littler Mendelson on Employment Law Class Actions* (Lexis Nexis 2007). Appendix O of that treatise contains a sample witness consent form to use in employment law class actions when conducting a " 'blitz' campaign of affidavit gathering." Dkt. # 137, Exh. D. The sample form states in part: "The lawsuit is a class action and you are a potential class member ."It does not contain a provision requesting the witness to keep the discussion confidential and privileged. *Id.*

DISCUSSION

Given that class actions present "opportunities for

abuse as well as problems for courts and counsel in the management of cases," the Supreme Court has recognized the duty and broad authority that a district court has "to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Company v. Bernard,* 452 U.S. 89, 100 (1981). However, a district court's discretion is not unlimited. Any discovery limitations should be carefully drawn and balance the potential for abuse with the right of the parties to contact potential class members. *Id.* at 101 (requiring decision to be based on clear record and specific findings); *Williams v. Chartwell Financial Services, Ltd.,* 204 F.3d 748, 759 (7th Cir.2000). Abusive practices that district courts have considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; contain false, misleading or confusing statements; and undermine cooperation with or confidence in class counsel. *Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc.,* 214 F.R.D. 696, 698 (S.D.Ala.2003) (collecting cases).

Plaintiff asserts that defendants questioned and obtained declarations from potential class members under the pretext of an employer-required training session. Defendants contend that they brought their employees to Lake Lawn for an actual training. This may be true, but defendants certainly had another purpose in mind and did not inform their employees of their intentions. Although the manner in which the employees were solicited for defendants' "blitz campaign of affidavit gathering" is cause for some concern, it alone would not justify limiting discovery. Similarly, the mere fact that the employment relationship is inherently coercive does not justify restricting defendants' communications with their employees. *McLaughlin v. Liberty Mutual Insurance Company,* 224 F .R.D. 294, 298 (D.Mass.2004). However, considering these factors along with defendants' less than full disclosure of the affiants' potential interest in this lawsuit, I am persuaded that a limitation on defendants' communication with potential class members is necessary.

**\*4** Although they apparently do not recall doing so, Zrout and Tuescher signed a consent form provided by defendants. The witness consent form appropriately informed employees of the lawsuit and that they were not represented by defendants' attorneys, had the right to refuse to be interviewed and could not be

retaliated against for not participating in the interview. However, as plaintiff asserts, the consent form has two significant problems. First, although it advised potential class members that the lawsuit at issue was a class action, it did not notify them that they might be entitled to become a part of the lawsuit. It is not reasonable to infer that the mere mention of a class action would alert an employee to the possibility that he or she may be a class member entitled to recover money from defendants. Further, the notice did not mention that signing an affidavit might waive the affiant's right to become a named class member. Second, the statements concerning the privileged and confidential nature of the discussions are also misleading and somewhat coercive. Defendants have not asserted any basis for such assertions or for their request for confidentiality of potential class members, although confidentiality impedes fair and open discovery. I am persuaded that defendants did not merely overlook these issues. The sample consent form included in *Littler Mendelson on Employment Law Class Actions* states clearly that witnesses should be informed that they may be potential class members and it does not include a statement concerning confidentiality or privilege.

After balancing the potential for abuse with defendants' right to contact potential class members, I find justification for some limitations on defendants' communications with potential class members. Until the court reaches a final decision on certification and any resulting opt-in period is completed, defendants are to obtain prior consent of this court if they wish to communicate with potential class members. They should be prepared to inform the court of the method and content of their desired communications. Whether plaintiff will be entitled to have a representative present is a decision the court will make on a case-by-case basis. The court may be satisfied that defendants' proposed communication is not coercive and sufficiently informs potential class members of their rights. For example, defendants might choose to present potential class members with a written questionnaire that has been pre-approved by the court.

Because the affidavits at issue were not executed in a proper manner and with full disclosure to the affiants, I am striking them. *See* dkt. # s 47-108. I also agree that if the court conditionally certifies a collective action, at a minimum some form of a corrective notice will have to be sent to the 62 potential class

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

members who made declarations. The court will address the specific content of the notice if and when the class is certified.

**\*5** Finally, I am not awarding plaintiff attorneys' fees or costs for bringing the motion. Rule 37 supports only the reimbursement of fees and costs resulting from a failure to disclose, admit or obey a court order related to discovery; it does not support a grant of fees and costs for bringing a motion for sanctions based on pre-filing activity. Fed.R.Civ.P. 37(a)(5), (b) and (c); *Maynard v. Nygren,* 332 F.3d 462, 470-71 (7th Cir.2003). Further, I do not find it necessary to impose sanctions under this court's inherent powers. *Maynard,* 332 F.3d at 470-71. The relief ordered by the court should be sufficient to address plaintiff's concerns.

ORDER

IT IS ORDERED that plaintiff's motion for a protective order is GRANTED in part and DENIED in part:

1. Before contacting or communicating with potential class members in this action, defendants shall obtain this court's approval of the method and content of the proposed communication;

2. Plaintiff's request that the court strike the 62 affidavits submitted by defendants in support of their opposition to the motion for conditional certification is GRANTED. The clerk is directed to strike docket numbers 47 through 108 from the court record;

3. Ruling on plaintiff's request for corrective notice is RESERVED until a final decision is made on conditional certification; and

4. Plaintiff's request for fees and costs is DENIED.

W.D.Wis.,2007.
Sjoblom v. Charter Communications, LLC
Slip Copy, 2007 WL 5314916 (W.D.Wis.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.